UNITED STATES of America

v.

Tyrone B. DIGGS, Appellant.

UNITED STATES of America

v.

Garrett J. KEYS, Appellant.

UNITED STATES of America

v.

Percy FLOYD, Appellant (two cases).

Nos. 73–1667, 73–1750, 74–1010, 74–1011.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1974.

Decided Nov. 3, 1975.*

* Supplemental Statements on Petition for Rehearing En Banc to be Filed.

Robert W. Healy, Washington, D. C., appointed by this Court, for appellants in Nos. 73–1750 and 73–1667.

Lois Goodman, Washington, D. C., appointed by this Court, for appellant in Nos. 74–1010 and 74–1011.

Albert H. Turkus, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Roger M. Adelman, Asst. U. S. Attys., were on the brief for appellee.

Before DANAHER, Senior Circuit Judge, WILKEY, Circuit Judge, and JUSTICE,* United States District Court Judge for the Eastern District of Texas.

Opinion for the Court filed by Senior Circuit Judge DANAHER.

DANAHER, Senior Circuit Judge:

We have here consolidated appeals [1] following jury verdicts establishing the

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The Keys appeal in No. 73–1750 followed his convictions on two counts of bank robbery

guilt of each of the appellants. We will discuss first the claims that the trial judge erred in denying their motion to suppress the evidence seized following their arrest by two Special Agents of the Federal Bureau of Investigation.

## I

On February 11, 1972, about 9:30 a. m. the District of Columbia National Bank branch on Wisconsin Avenue was robbed by two armed men. A woman in a store across the street saw two men, one wearing a ski mask and the other with his face covered, leave the bank and enter a getaway car, a green Chevrolet, driven by a third man. Earlier, about 9:10, another witness had seen two black men some three to four blocks from the bank as they were parking a white Cadillac car with a red leather panel on the door. She testified that about 10:15 she saw that a green car had knocked over some trash cans near her neighbor's driveway and that the Cadillac was gone.

The Government's evidence at trial developed that the taller of the two robbers with gun in hand was carrying an attache case and was wearing a gray ski mask, a dark raincoat, gloves, brown or tan trousers and brown "hush puppy" shoes. He had gone to each teller window, gathering all currency and coins which he placed in his attache case.[2] The shorter of the two robbers stationed in the lobby was wearing a blue denim jacket and a black turtle neck pulled up around his face. He pointed his gun at the tellers and told them to get down, and when one of them moved, he grabbed her by the hair, pulled her back and ordered her to stay down.

An audit disclosed that the robbers had taken more than $5,000, including $400 of "bait money."

Word of the robbery reached the Washington Field Office of the FBI at approximately 9:30 a. m. and came to the notice of Special Agent Berry. The latter, with some 22 years of experience in the Bureau, had already been developing evidence involving appellants Diggs and Floyd as to other crimes, indeed only a fortnight earlier, Berry had arrested Diggs for his part in another robbery in which his distinctive red and white Cadillac had been utilized in the transportation of the avails of that robbery. Agent Berry was well aware that robbers might abandon a getaway car and switch to another waiting vehicle. Berry also knew that Diggs "hung out" in the 2200 block of M Street, N.E., where he had seen both Diggs and Floyd in the recent past. Taking Special Agent Mowrey with him, Berry, in an unmarked Bureau car, headed for that destination.

and two counts of armed robbery, with concurrent sentences of 5 to 15 years on each count.

The Diggs appeal in No. 73–1667 followed his convictions on two counts of robbery with concurrent sentences of 3 to 9 years on each count.

Floyd's appeal in No. 74–1011 followed his convictions on two counts of bank robbery and two counts of armed robbery with sentences of 5 to 20 years on each of the two bank robbery counts and 10 to 30 years on each of the armed robbery counts, such sentences to be served concurrently with each other, with a sentence previously imposed by the United States District Court for the Eastern District of Virginia and with a sentence previously imposed by a state court in Virginia. *And see* the correlation of the foregoing with the sentence imposed following a separate conviction in No. 74–1010, *infra* note 6.

The Government at pre-trial dismissed certain ADW counts and the jury was instructed to disregard two other lesser included ADW counts if it should find the armed robbery charges had been proved. *See United States v. Belt*, 169 U.S.App.D.C. 1, 514 F.2d 837 (1975) (en banc).

2. After that case had been retrieved from the Cadillac, it was shown to a teller who immediately recognized it and while the case remained closed, described in detail the inside of the case and its contents. When opened, the inside and the contents were found to conform precisely to the description the teller had given in advance.

En route, over the car radio, the agents monitored radio broadcasts put out by the FBI and by Metropolitan Police. They thus learned that one of the robbers at the bank was seen to be tall, to have worn a gray ski mask, gloves, a three-fourths length raincoat and to have been carrying a rust-colored brief case. They also learned that the second robber had worn a denim jacket, dark trousers and a black turtle neck. With the 2200 block under surveillance, the agents saw the Diggs Cadillac with three occupants coming toward them, with Diggs at the wheel. That car pulled up to the curb and stopped. The agents radioed for help, recognized Diggs and Floyd, and then alighted from the Bureau car.

Berry produced his identification, and with guns drawn, the agents approached the Diggs car and ordered the three occupants to raise their hands above their heads and to keep them there.

The agents noticed that the rear seat passenger, Keys was wearing a black trench coat and that next to him was a short denim jacket. In plain view at Keys' feet was a rust-colored brief case. Seeing that the car's occupants conformed to the monitored descriptions and with their reasonable suspicions confirmed, the agents then placed all three appellants under arrest. Search incident to that arrest developed that both Keys and Floyd possessed .38 caliber revolvers. Contemporaneous search of the brief case revealed more than $5,000 in cash, and in due course, the bank's bait money was identified.

■ That the agents were undertaking the steps as described for the purpose of investigating their powerful suspicion[3] that these appellants had been involved in the robbery is apparent. The agents had taken for their own protection and safety entirely reasonable precautions as they confronted the three ap-

pellants, at least two of whom had been armed during the bank robbery. See Adams v. Williams, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Coates, 161 U.S.App.D.C. 334, 337–39, 495 F.2d 160, 163–65 (1974); United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317, cert. denied, 406 U.S. 969, 92 S.Ct. 2427, 32 L.Ed.2d 669 (1972); United States v. James, 147 U.S.App. D.C. 43, 45–46, 452 F.2d 1375, 1377–78 (1971); Brown v. United States, 125 U.S. App.D.C. 43, 46 n.4, 365 F.2d 976, 979 n.4 (1966).

The courts have considered other aspects of situations such as had here been presented, see, e. g., Young v. United States, 140 U.S.App.D.C. 333, 337, 435 F.2d 405, 409 (1970); Bailey v. United States, 128 U.S.App.D.C. 354, 357, 362, 389 F.2d 305, 308, 313 (1967).

■ When the agents saw what Floyd was wearing, what Keys was wearing, when, in plain view, they saw the brief case and the denim jacket, ample probable cause for the arrest existed. United States v. Robinson, 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); United States v. Johnson, 143 U.S.App. D.C. 215, 220, 442 F.2d 1239, 1244 (1971) and see Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). After the arrest and as incident thereto, further search of the vehicle even revealed the ski mask which had been used in the commission of the crime. United States v. Free, 141 U.S. App.D.C. 198, 437 F.2d 631 (1970), and see generally the discussion, id., 141 U.S. App.D.C. at 201–202, 437 F.2d at 634–635; cf., Cardwell v. Lewis, 417 U.S. 583, 588–590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

We may, perhaps definitively, terminate further present treatment of appellants' contention that the search and seizure here had been invalid,[4] simply by

---

**3.** See Judge Friendly's opinion in United States v. Riggs, 474 F.2d 699, 703–705 (CA 2 1973).

**4.** The course here followed by the alert perceptive FBI agents reminds us of the factual de-

turning to this court's opinion in *Bailey v. United States, supra,* and to Judge Leventhal's concurring opinion, *id.,* 128 U.S.App.D.C. at 361–365, 389 F.2d at 312–316. There was no error in Judge Pratt's denial of the motion to suppress filed by Keys and Diggs with which Floyd had asked to be associated.

## II

### Floyd's Contentions

#### A

Quite apart from the bank robbery situation, Floyd presents another problem in his appeal No. 74–1010. Floyd had filed a written motion to dismiss the indictment which stemmed from another robbery, next to be treated. He contended that the jury selection system in the courts of the District of Columbia had improperly discriminated against young adults.[5] After extensive hearings, the district judge denied Floyd's motion to dismiss the grand jury indictment.

On November 3, 1971, three men armed with pistols entered the Minnesota Market in Southeast Washington. "Everybody go back," a robber ordered. An employee with a pistol pointed at his head was dragged to the front of the store by Floyd, positively identified at trial by various witnesses, including a young woman whose boy friend "ran around" with Floyd. This employee's wallet containing $18 was taken from him, and he was ordered to open a cash register. When it developed he was unable to comply, the robbers seized as much money as possible and fled from the store. The jury found Floyd guilty of two counts of armed robbery and four counts of assault with a dangerous weapon.[6]

Floyd's indictment by a grand jury sworn in on October 6, 1971, had charged him with participation in the robbery and assault with a dangerous weapon, just described. His motion, first, to dismiss that indictment, and later, his motion to strike the petit jury panel, had been based on his claim that there had been unlawful discrimination against young people in the District of Columbia compilation of eligible jurors.[7]

Through an expert witness, he sought to establish by a mathematical test, the

velopments in *Coleman v. United States,* 137 U.S.App.D.C. 48, 51, 53, 420 F.2d 616, 619, 621 (1969); consider the "collective information" relied upon by officers in *Smith v. United States,* 123 U.S.App.D.C. 202, 204, 358 F.2d 833, 835, *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967).

When we take account of the exigent situation confronting these agents and the facts of which they had knowledge as well as those creating the basis for their reasonable suspicion, probable cause was clear, and the course pursued by the agents was lawful. It makes little difference where the officers seized two .38 caliber revolvers from Floyd and Keys whether we are talking about a permissible "frisk" incident to an investigative stop, as in *Terry, supra,* or whether there has been a "lawful" arrest. *See United States v. Robinson,* 414 U.S. 218, 234, 235, and cases cited at 236, 94 S.Ct. 467, 476, and cases cited at 477, 38 L.Ed.2d 427 (1973); *see Gustafson v. Florida,* 414 U.S. 260, 263, 264, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). *Compare Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) and cases cited, including *Chambers v. Maroney,* 399 U.S. 42, 47, 51,

90 S.Ct. 1975, 1979, 1981, 26 L.Ed.2d 419 (1970).

5. On the same basis he later made an oral motion to strike the petit jury. However, he used only four of his ten peremptory challenges, and in any event has failed to indicate any possible prejudice.

6. Floyd following his convictions in this case was sentenced to serve 8 to 24 years on each count of armed robbery and 3 to 10 years on each count of assault with a dangerous weapon, these sentences to be served concurrently with each other and with a sentence previously imposed by a state court in Virginia but consecutively to sentences already imposed by the U. S. District Court in Virginia and by the District Court in the bank robbery case, No. 74–1011, *see* footnote 1, *supra.*

7. 28 U.S.C. § 1862 provides that no citizen shall be excluded from service as a grand or petit juror "on account of race, color, religion, sex, national origin or economic status." The statute makes no mention of the factor of "age."

"chi square test," an underrepresentation of various age groups who should have been selected at random from a fair cross section of the community. Floyd contended that there had been a failure to comply with the requirements of 28 U.S.C. § 1863 in the formulation of a plan for random jury selection. His expert concluded from his study of the selection process that the actual number of jurors in the age group 21–24 in the District Court petit jury panels was only one-quarter of the numbers he expected. Similarly, the actual number in the age group 25–29 was one-third of the number he would have expected to find, he said. The expert witness then concluded that the selection process resulted in underrepresentation of the younger age groupings and was not random. The trial court deemed that Floyd had presented *prima facie* evidence of discrimination against young persons in the District of Columbia jury selection process.

The Government then presented various witnesses including the Director of Data Processing at the Superior Court who explained the process by which all jury panels for the District of Columbia courts were selected. Unlike the course followed elsewhere, 28 U.S.C. § 1863(b)(2) expressly provides that

> The plan for the District of Columbia may require the names of prospective jurors to be selected from the city directory rather than from voter lists.

Utilizing a computer program, the data processing unit had selected some 60,000 names chosen at random from the Polk Directory for the District of Columbia. The process so begun was further refined, when a group of people, some 12,000 in number selected at random, had been recipients of questionnaires, prepared by the Jury Commission. From the responses, that Commission determined whether people should be considered eligible, disqualified, exempt or excused, and from among those deemed eligible, jury panels each month were selected by the computer on a random basis.

The United States District Court, pursuant to 28 U.S.C. § 1863, adopted a MODIFIED PLAN FOR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA FOR THE RANDOM SELECTION OF GRAND AND PETIT JURORS,[8] with explicit directions, *inter alia,* for the compilation of a master jury wheel and the use of the R. L. Polk Company's city directory. The Plan conferred authorization, subject to the supervision and control of the Chief Judge, to the Jury Commission, to adopt a selection procedure which the Court has found "shall result in the drawing of names proportionally representing a cross section of all parts of the District."

The Jury Commission is required to prepare an alphabetical list of names drawn, not to be disclosed except on order of court or pursuant to 28 U.S.C. §§ 1867 and 1868. Thereupon, if the Commission shall determine that to supply court jury requirements, for example, for 18 months, it will need 60,000 names in the master wheel, and if there is a total of 600,000 names in the R. L. Polk file, a "quotient" formula must be devised. Thus the total will be divided by the number of names required, so that, as here, if the quotient be 10, every tenth name would then be taken for the master wheel.

We interrupt our analysis to observe that there was no proof of purposeful exclusion of any cognizant group, whether of youth or of any other (presently pertinent) coherent, identifiable class, *see generally* the discussion in *Ware v. United States,* 123 U.S.App.D.C. 34, 37–38, 356 F.2d 787, 790–791 (1965), *cert. denied,* 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673 (1966). Nor was there evidence that Floyd had been prejudiced in any way by the denial of his motion to strike the *petit* jury panel.[9]

Rather, after the extensive hearings which had been conducted, the judge could see that Floyd at most had

---

**8.** Government Brief, pp. 40 *et seq.*

**9.** See note 5, *supra.*

shown only that the names of persons under age 30 had appeared on the master wheel somewhat less frequently than was representative of their numbers in the general population.[10] Assuming that, statistically, such was the fact, the same could be said respecting persons thereafter actually chosen to sit on petit juries.[11]

■ The simple fact is that the Jury Selection Act provides no criteria for the identification of young people as a class. It may even be doubted that "young people" constitute a sufficiently coherent group to require their selection as part of a representative cross section of the community. "[C]laims of exclusion of the young from juries have met with little success in the federal courts," *Hamling v. United States,* 418 U.S. 87, 137, 94 S.Ct. 2887, 2917, 41 L.Ed.2d 590 (1974) (footnote omitted). We intimated as much (*dictum*) in *United States v.*

*Greene,* 160 U.S.App.D.C. 21, 23–26, 489 F.2d 1145, 1147–1150 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974), and other courts have more firmly taken a positive position to the effect that there is nothing in the statutes or in the case law identifying youth as a cognizant group.[12]

We find no error whatever in Judge Bryant's denial of Floyd's motion to dismiss the indictment and his denial of the motion to strike the jury panel.

## II

## B

■ Floyd here has further contended that the trial judge erroneously declined to permit his counsel to inquire whether or not the prospective jurors "have had any dealings or experience with black persons that might make it difficult for them" to sit in judgment on this case.

---

**10.** Floyd's expert conceded on cross-examination that his analysis had not taken account of persons excused from jury duty by the court and that his analysis had been based on the relatively small numbers of responses received by the Jury Commission from the large number of questionnaires sent out. Taking into consideration such additional factors, one exhibit showed the distribution of jury venires by age, so that for the group 21–24, the actual distribution would be 10.2 per cent against an expected 14.3 per cent, and for the group 25–29, the actual distribution would be 10.6 per cent·against an expected distribution of 14.7 per cent. Jury Commissioner Carusi testified that certain categories of exclusion from jury duty tended to apply more importantly to those between the ages of 21 and 30. These included persons in the armed forces, women caring for children under 10 years of age, practical nurses, students away at college and the like. Mr. Carusi emphasized that the Jury Commission never excused young people in the 21–30 age group solely because of age, indeed, as the law then read, age was a factor in the Commission's operations only to the extent that persons under 21 were ineligible and those over 70 could be excused upon request.

**11.** The Court has made it clear that even though petit juries must be drawn from a source fairly representative of the community, there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana,* 419 U.S.

522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975).

The Court compendiously has stated for us the governing rule that

the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

*Id.,* at 538, 95 S.Ct. at 702.

It is evident that after full hearings, the judge here had concluded there was no systematic exclusion of young people as a distinctive group. He realized that there had been no purposeful failure to regard "youth" as a cognizant classification.

**12.** *See generally: United States v. Olson,* 473 F.2d 686, 688 (CA 8 1973); *United States v. Gast,* 457 F.2d 141, 142–143 (CA 7), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972); *United States v. Gooding,* 473 F.2d 425, 430 (CA 5 1973); *United States v. Blair,* 470 F.2d 331, 334–337 (CA 5 1972); *United States v. Guzman,* 468 F.2d 1245, 1247–1248 (CA 2 1972); *United States v. Ross,* 468 F.2d 1213, 1217 (CA 9 1972); *Chase v. United States,* 468 F.2d 141, 144–146 (CA 7 1972); *United States v. Kuhn,* 441 F.2d 179, 180–181 (CA 5 1971); *cf. United States v. Camara,* 451 F.2d 1122, 1125–1126 (CA 1 1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1513, 31 L.Ed.2d 808 (1972). *But see United States v. Butera,* 420 F.2d 564, 570 (CA 1 1970).

This question [13] and others had been canvassed with the prosecutor and the judge *before* the prospective jurors entered the courtroom. The judge might readily have thought the equivocal phraseology had failed to present an issue and that the question might be rephrased and made specific. Floyd's counsel did no more about it, whether by way of argument or objection or otherwise. The respective counsel went on to ask the prospective jurors as to any possible preconceived notions as to Floyd's guilt or innocence. Counsel inquired whether or not these jurors would hear the case fairly and impartially and decide solely on the evidence presented in the courtroom.

*After* counsel saw the prospective jury, no effort was made by detailed questions to disqualify any prospective juror. On the contrary, Floyd's counsel did not even exhaust the peremptory challenges to which he was entitled. It might be assumed that Floyd took his chances with the jury as selected.[14]

It now is being argued that we are bound to reverse, counsel relying upon *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) where the judge, the victim, (a white policeman) and all members of the jury were white while Aldridge was a negro. Floyd points further to *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), where the accused, a black bearded civil rights activist, had

alleged that local law enforcement officials had "framed" him on charges of possession of marijuana. The judge and most of the jury panel were white. The Supreme Court, 409 U.S. at 527, 93 S.Ct. at 850, ruled that "the Fourteenth Amendment required the judge *in this case* to interrogate the jurors upon the subject of racial prejudice."[15] (Emphasis added).

From our post-trial vantage point, it is easy enough to say that the judge could readily have asked counsel's question despite its imperfection. The judge himself could have reframed the inquiry, but his failure to do so is not fatal. Floyd had made no effort whatever to establish any such factual situation as can be noted in *Aldridge* and *Ham.* Nothing was shown actually to cause the judge to inquire into possible prejudice against Floyd because he was black. It would seem that some development of a situation of that sort is essential since the Court itself has so read those cases. *See, e. g., Hamling v. United States,* 418 U.S. 87, 140, 94 S.Ct. 2887, 2919, 41 L.Ed.2d 590 (1974). There the opinion notes that *Aldridge* and *Ham* had held that *"in certain situations* a judge must inquire into possible racial prejudices of the jurors in order to satisfy the demands of due process." (Emphasis added).

Such a limiting evaluation of the significance of the language quoted would seem the more cogent if we consider

**13.** Counsel on brief has told us that "the record clearly shows no other questions were asked involving specifically any potential racial prejudice." Note that Floyd's counsel did not seek to elicit possible *bias against Floyd* because he was black. Cf. *United States v. Grant,* 494 F.2d 120, 121 (CA 2 1974). Counsel might just as well have proposed to ask whether the prospective jurors here had any dealings or experience with *white* persons that "might make it difficult" for them to sit in judgment in this case.

**14.** "We need draw no conclusion concerning whether or not it was . . . for the purpose of creating the basis now asserted for objecting to the jury's composition," as Mr. Justice Rutledge put it in *Frazier v. United States,* 335 U.S. 497, 506, 69 S.Ct. 201, 206, 93 L.Ed. 187 (1948).

We here will indulge in no speculation. Rather, we can say with reasonable certainty in light of the overwhelming evidence arrayed against Floyd, there has been no showing that he suffered prejudice here.

**15.** Not unlike the manner in which the issue had arisen in *Aldridge* and *Ham, supra,* was that presented in *King v. United States,* 124 U.S.App.D.C. 138, 362 F.2d 968 (1966) where the victim and the majority of the veniremen were white and the defendant was black. Our discussion, text *infra,* as to limitations upon *Aldridge* and *Ham* will, of course, apply to the *King* case which had followed *Aldridge.*

*Ross v. Massachusetts*, 363 Mass. 665, 296 N.E.2d 810, *certiorari denied*, 414 U.S. 1080, 94 S.Ct. 599, 38 L.Ed.2d 486 (1973). The dissenting views of Mr. Justice Marshall sharply focused on the racial prejudice issue which arose in a trial where a white security officer had been the victim of assault by Ross and other young negroes. *See* 414 U.S. 1082–1083, 94 S.Ct. 599. The majority in its denial of *certiorari* could not possibly have failed to realize the impact of the dissent.[16]

Floyd's reliance upon the *Aldridge* and *Ham* cases definitely is misplaced. We are satisfied that the views we have expressed correctly reflect applicable law which indicates the course to be followed here. Other circuits after consideration of the problem have taken a similar position. *See, e. g., United States v. Walker*, 491 F.2d 236, 239 (CA 9), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 768 (1974) and *United States v. Grant*, 494 F.2d 120, 122–123 (CA 2 1974). We reject Floyd's claim of error in the respects under consideration.

## II

## C

We now reach Floyd's contention that the trial judge fatally erred when, in the absence of counsel the judge undertook to respond to the jury's request for further instructions. Details presently will be discussed.

Of course, it is so that an accused is entitled to be present at every stage of his trial, Fed.Rule Crim.Proc.

43. Especially since *Shields v. United States*, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927), the courts have frowned upon communications between judge and jury in the absence of the defendant and his counsel. In usual course, a jury's message should be answered in open court, with an opportunity afforded to counsel to be heard before the trial judge undertakes to respond. *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975).

However, a failure to comply with the requirements of Rule 43 does not call automatically for reversal. The situation requires consideration in light of Fed.Rule Crim.Proc. 52(a), and so there "may in some circumstances be harmless error," *Rogers v. United States, supra*, 422 U.S. at 40, 95 S.Ct. at 2095.[17] The "circumstances" to be considered will be, *inter alia*, "the nature of the information conveyed to the jury, in addition to the manner in which it was conveyed," *id.* 422 U.S. at 40, 95 S.Ct. at 2095. The trial judge might there have induced unanimity, said the Court,

by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise, *Id.*

The judge had responded to the jury's inquiry in the absence of the accused and his counsel. Moreover, the judge had quite erroneously failed to instruct that the jury had no sentencing function and should reach its verdict without regard to what sentence might be imposed. The cumulative errors were seen to be

---

**16.** Justice Marshall indeed had concluded, in *Ross*,

To deny this petition for *certiorari* is to see our decision in *Ham v. South Carolina* stillborn and to write an epitaph for those "essential demands of fairness" recognized by this Court 40 years ago in *Aldridge.* *Id.,* 414 U.S. at 1085, 94 S.Ct. at 602.

**17.** We may profitably take account of the opinion in *United States v. Compagna*, 146 F.2d 524, 528 (CA 2 1944), *cert. denied*, 324

U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945) where Judge Hand observed:

. . . while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity.

*Cf. United States v. Graham*, 102 F.2d 436 (CA 2 1939) where, at 444, the court noted there had been no prejudice of substantial rights despite the absence of counsel.

"fraught with potential prejudice." at 41, 95 S.Ct. 2091.[18]

■ We here take up what happened in the instant case. The jury had retired to consider its verdict at 4:30 p.m. on April 5, 1973. At six p.m., no verdict having been reached, the jury was released with directions to resume deliberations at 9 a.m. the following day, and it did so.

On April 6, 1973, at 4:37 p.m., and before the jury was brought in to the court room to render its verdict, the judge informed the parties that earlier, and in their absence, there had been a communication from the jury.

> THE COURT: When the jury came back from lunch, I received the following note:
>
> > We have reached a decision on all counts with the exception of one juror. Would you give us further instructions on the one holdout. Thank you. Peter J. Long.
>
> I replied:
>
> > I regret that I cannot give you any instructions on the above. All I can say is that you should continue your deliberations. You have been in session for four and a half hours which is not unusually long. If I discharge the jury without a verdict being reached one way or the other, the case will have to be retried.
>
> That was it. I am going to make that a part of the record.

Except for asking for some of the exhibits, that is the only message we got.

When the judge in the presence of all defendants and their counsel concluded the foregoing recitation for the record, no objection was raised by any of the attorneys. There was no complaint that the jury had been coerced into agreement during the afternoon's deliberations. Seventeen days later, Floyd's counsel alone reverted to the episode in connection with Floyd's motion for a new trial which the judge denied.

Floyd now argues that had his counsel been present some two or more hours earlier when the judge, as above, replied to the jury's request, counsel would have been able to note an objection. Yet, when, *before* the return of the verdict, counsel had been informed as to just what had transpired, she registered no objection. She certainly had been aware of the various counts and of the evidence in support of each charge. Even *after* the verdict had been returned, she made no comment.[19] It would appear from her belated complaint that she had stood by having elected to take her chances as to just what verdict might be returned. Indeed, after she heard the bad news, we re-emphasize, no objection was voiced, and the conclusion would seem inevitable that no prejudice was then perceived, and we see none now. *Cf. United States v. Johnson,* 139 U.S.App.D.C. 193, 200, 432 F.2d 626, 633, *cert. denied,* 400 U.S. 949, 91 S.Ct. 257, 27 L.Ed.2d 255 (1970).[20]

---

**18.** *See United States v. Glick,* 463 F.2d 491, 493 (CA 2 1972).

A not entirely dissimilar situation arose in our own case of *United States v. Patrick,* 161 U.S.App.D.C. 231, 494 F.2d 1150 (1974), where the Government argued that a response by the trial judge constituted, at most, harmless error. There the judge consulted with the appellant and defense counsel before informing the jury they might make a recommendation for psychiatric treatment along with a verdict of murder in the second degree. We read that response as aimed, 161 U.S.App.D.C. at 236, 494 F.2d at 1155,

> at facilitating a compromise verdict by soliciting information that would assure those dissenting jurors, who would not otherwise

have acquiesced, that appellant would receive treatment. (*See, id.,* note 9).

In *Patrick,* the jury had informed the court that it had been "unable to reach a verdict— ten find [appellant] guilty, and two not guilty by reason of insanity." *Id.,* 161 U.S.App.D.C. at 234, 494 F.2d at 1153.

**19.** *Cf. Ware v. United States,* 376 F.2d 717, 718 (CA 7 1967) where the court ultimately finding harmless error, commented:

> His trial counsel, though present, found no basis for objecting to what the court did, nor for asking that it do more. He made no objection to proceeding in Ware's absence.

**20.** As the Fourth Circuit put it where an objection was first raised *after* the verdict:

We carefully considered this very subject in *Walker v. United States*, 116 U.S. App.D.C. 221, 222, 322 F.2d 434, 435 (1963), *cert. denied*, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964). There, under the circumstances shown, we ruled against reversal where the record had shown "with reasonable certainty" that there had been no prejudice to the defendant's "substantial rights," Fed.Rule Crim.Proc. 52(a).[21]

It is clear enough that the trial judge should not have communicated with the jury in the absence of the defendants and their counsel. Even so, in light of the permissible "harmless error" considerations open to us pursuant to *Rogers v. United States*[22] and other authorities cited,[23] we conclude that there has been no reversible error on that account. No slightest showing of prejudice has been made to appear; the evidence of Floyd's guilt in particular—and that of his codefendants—was overwhelming.

> Finally, the conclusion of harmless error is confirmed by the failure of the appellant through his counsel, to raise any objection until after the verdict . . . . Had it appeared to the appellant or his counsel that the action of the District Court involved any prejudice, objection would have been promptly entered by the appellant and not tardily raised after verdict.
> *United States v. Arriagada*, 451 F.2d 487, 489 (CA 4 1971), *cert. denied*, 405 U.S. 1018, 92 S.Ct. 1300, 31 L.Ed.2d 481 (1972). *Cf. Jackson v. United States*, 128 U.S.App.D.C. 214, 386 F.2d 641 (1967) where, as here, counsel had remained silent throughout the poll, and no objection had been voiced until after the verdict had been returned.

**21.** The conclusion we reached in *Walker*, text *supra*, has not gone unnoticed, *see, e. g., United States v. Arriagada, supra*, note 20; *United States v. Schor*, 418 F.2d 26, 29 (CA 2 1969) where, at 30, the court could not say that the judge's unfathomable reply to the jury's obscure question did not affect the verdict; *Ware v. United States, supra* note 19 (harmless error); *United States v. Howard*, 433 F.2d 1 (CA 5 1970) (harmless error), *cert. denied*, 401 U.S. 918, 91 S.Ct. 900, 27 L.Ed.2d 819 (1971); *United States v. Glick*, 463 F.2d 491, 493 and note 11 (CA 2 1972); *United States v. Calabro*, 467 F.2d 973, 989, note 7 (CA 2 1972) (distinguishing *United States v. Glick, supra*), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); *United States v. Hoffa*, 367 F.2d

Floyd insists that the reply to the jury's request for instructions was coercive. That reply, set forth *supra* page 18, is completely factual, it can be seen, down to the last sentence wherein its vice is said to lie. The judge had not suggested what verdict should be returned, indeed the jury had not indicated, "one way or the other" just what "decision" the jurors had reached. We must read the excerpt "have to be retried" as an inadvertence,[24] and totally superfluous in view of the magnitude of the crimes, so well known to all concerned. Perhaps the language could be taken as neutral, having in mind that a verdict could be reached "one way or the other." In any event, as we said in *Fulwood v. United States*, 125 U.S.App.D.C. 183, 186, 369 F.2d 960, 963 (1966), *cert. denied*, 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996 (1967):

> The statement that some other jury would have to decide the case if this

698, 713 (CA 7 1966), *vacated on other grounds*, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967); *cf. Bustamonte v. Cardwell*, 497 F.2d 556, 558 (CA 9 1974) (no prejudice shown); *cf. United States v. Jones*, 170 U.S.App.D.C. 362, 368, 517 F.2d 176, 182 (1975).

**22.** *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), our text *supra*, 173 U.S.App.D.C. page ——, 522 F.2d page 1319. The argument before the Court reported April 22, 1975, 43 LW 3565, had alerted readers to the possibility of impending authoritative treatment of an aspect of the issue pending here.

**23.** *See* note 21, *supra*.

**24.** Of course, a mistrial need not "require" a retrial. Witnesses disappear; other considerations often affect the prosecutor's discretion; the problem may involve a "close and difficult issue of coercion in fact under the surrounding circumstances." That was the situation (but not present here) in *United States v. Thomas*, 146 U.S.App.D.C. 101, 108, 449 F.2d 1177, 1184 (1971) (*en banc* with four judges dissenting). The "close" balance in *Thomas* is in no way to be compared with the strong case before us now.

The Court saw "coercion" in *United States v. Jenkins*, 380 U.S. 445–446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); *cf. United States v. Smoot*, 150 U.S.App.D.C. 130, 132, 463 F.2d 1221, 1223 (1972).

one could not was accurate as a generality and, in any event, could have had no coercive impact on the jury. If they already knew what would likely happen if they deadlocked, it was surplusage; if they did not know, this information, far from being coercive, would have had the effect of reducing the pressure on them to reach a verdict.[25]

In *Fulwood,* we concluded that the remarks of the judge were nonprejudicial and noncoercive. We take the same position here.

■ We find no merit whatever in Floyd's claim that he was entitled automatically to a mistrial on the ground that the jury had made an unsolicited disclosure of its numerical division. As authority, Floyd points to *Brasfield v. United States,* 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), but there, the *judge* erroneously had required the jury to disclose the extent of its division. Floyd cites *Mullin v. United States,* 123 U.S. App.D.C. 29, 356 F.2d 368 (1966). The issue in *Mullin* involved the appellant's claim of double jeopardy presented in a second trial after an earlier mistrial had been ordered. It must there have appeared to the first trial judge just as obviously as it does to us that the *Mullin* jury was in hopeless confusion where the foreman reported that the jury stood 7

for a guilty verdict, 4 for a not guilty verdict with one juror undecided. So it was that *Mullin* held that there had been no double jeopardy since the mistrial properly had been granted. Floyd also points to *Williams v. United States,* 119 U.S.App.D.C. 190, 338 F.2d 530 (1964). There, the majority not only had reported disagreement but actually went on to ask the trial judge to replace the minority with two alternate jurors. Sensing the degree of coercion implicit in those circumstances, we noted additionally that the trial judge had compounded the confusion by what was said during his further colloquy with the jury and by the instructions he submitted.

Substantial authority runs against Floyd's claim. *See, e. g., United States v. Jennings,* 471 F.2d 1310, 1313–1314 (CA 2), *cert. denied,* 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973), where the jury, unsolicited, reported that it stood 11 to 1 for conviction; *United States v. Martinez,* 446 F.2d 118 (CA 2), *cert. denied,* 404 U.S. 944, 92 S.Ct. 297, 30 L.Ed.2d 259 (1971); *Sanders v. United States,* 415 F.2d 621, 629, 631–632 (CA 5 1969), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970); *United States v. Rao,* 394 F.2d 354, 356 (CA 2), *cert. denied,* 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968); *United States v. Williams,* 444 F.2d 108, 109 (CA 9 1971).[26]

25. Our opinion there, written by Judge (now Chief Justice) Burger, approached the issue taking account of the Allen charge, *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). There was no Allen charge in the instant case. More than once of late we have considered the impact of the Allen language. For example, we assayed various phases (not overlooking Fulwood), in *United States v. Johnson,* 139 U.S.App.D.C. 193, 200, 432 F.2d 626, 633, *cert. denied,* 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970). We weighed possibilities again in *United States v. Thomas, supra* note 24. There, for all practical purposes, explicit coercion was perceived —(retrying the case where such a backlog existed "just doesn't make sense to me," said the judge).

Nothing of the sort is shown on our record where the evidence of guilt is so compelling. Moreover, unlike *Thomas,* the jury had not declared itself hopelessly deadlocked. Indeed,

were we to speculate in terms of plausibility, whatever problem had disturbed the jury did not involve Floyd at all, only Diggs. Both Floyd and Keys who actually entered the bank were found guilty of bank robbery, 18 U.S.C. § 2113(a), and armed robbery, 22 D.C.Code §§ 2901 and 3202. On the other hand, as to Diggs, the driver of the getaway car, who had not entered the bank at all, the jury returned its verdict of not guilty of bank robbery and of armed robbery. He was found guilty only of robbery as defined in 22 D.C.Code § 2901, subject in any event to treatment as a principal, 18 U.S.C. § 2, D.C.Code § 22–105; *cf. United States v. Parker,* 143 U.S.App.D.C. 47, 442 F.2d 779 (1971).

26. The fact that some of these cases in some degree involved versions of the Allen charge does not impair the weight we are inclined to give to them. *See* n. 25, *supra.*

We are satisfied that Floyd's respective appeals in Nos. 74–1010 and 74–1011 must be rejected *in toto*.[27]

We find no error in the trials of any of these appellants.

## CONCLUSION

We turn now to various problems involving the sentences imposed upon each of the appellants.

■ Taking up, first, *United States v. Floyd,* No. 74–1010, the jury on November 22, 1972, returned its verdict of guilty on two counts of armed robbery and four counts of assault with a dangerous weapon. We vacate the latter convictions for the ADW counts were lesser included offenses under the armed robbery counts. *United States v. Johnson,* 155 U.S.App.D.C. 28, 29, 475 F.2d 1297, 1298 (1973); *cf. United States v. Canty,* 152 U.S.App.D.C. 103, 118 note 21, 469 F.2d 114, 129, note 21 (1972). Comparable treatment was discussed in *United States v. Caldwell,* sl. op. 66 and notes 177, 178 and 179 (D.C. Cir. December 31, 1974, not yet reported; *and see United States v. Belt,* 169 U.S.App.D.C. 1, 3, and note 3, 514 F.2d 837, 839, and note 3 (1975) (en banc).

■ We let stand the convictions on two counts of armed robbery, for there were two distinct offenses perpetrated at the Minnesota Market. One involved the property of the store owners as discussed in our text, pages 6 and 7, *supra.* We do not view this episode as a "unitary transaction," *cf. United States v. Hopkins,* 150 U.S.App.D.C. 307, 313–314, 464 F.2d 816, 822–823 (1972), for the second armed robbery count concerned the robbery of an employee *whose own property,*[28] his wallet containing $18, was taken from him at pistol point by Floyd. *See Barringer v. United States,* 130 U.S. App.D.C. 186, 399 F.2d 557 (1968), *cert. denied,* 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969); and *United States v. Dixon,* 152 U.S.App.D.C. 200, 203, n. 15, 469 F.2d 940, 943, n. 15 (1972). (As to sentence, see note 6, *supra*).

■ Different treatment is required in *United States v. Floyd,* No. 74–1011, where the jury returned guilty verdicts on two counts of bank robbery under the federal statute, followed by concurrent sentences of 5 to 20 years on each count; and two counts of armed robbery under the D.C.Code, for which concurrent sentences of 10 to 30 years on each count were pronounced. *See* footnote 1, *supra.*

In *United States v. Canty,* 152 U.S. App.D.C. 103, 115, 469 F.2d 114, 126 (1972) it was pointed out

The crime is *bank* robbery, and the statute is entitled "Bank Robbery and Incidental Crimes." There is no doubt here that only one transaction took place and that only one bank was robbed. Compare *United States v. Hopkins.* [*Supra*]

■ *Canty* rejected the Government's contention that the robbery of each teller could predicate a separate taking within the language of 18 U.S.C. § 2113(a). Accordingly, as in *Canty* we must vacate one conviction of bank robbery. Moreover, we vacate one conviction of armed robbery under the D.C. Code. *See* footnote 1, *supra.* We vacate the sentences on one count of bank robbery and on the remaining count of armed robbery and remand for re-sentencing by the district judge.[29] It is to be ex-

---

27. Since Floyd's appeal in No. 74–1010 was consolidated by this court's order with his appeal in No. 74–1011, we have followed the format of his counsel's brief, discussing the jury composition claims in our Part II–A.

28. *See United States v. Spears,* 145 U.S.App. D.C. 284, 293, 449 F.2d 946, 955 (1971); *cf. Irby v. United States,* 129 U.S.App.D.C. 17, 390 F.2d 432, 433 (1967) (*en banc*).

29. *Compare* our present treatment with the important discussion in *United States v. Caldwell, supra,* slip opinion page 67 with pertinent footnotes and page 68 where the federal convictions were vacated and re-sentencing was to be predicated upon certain nonfederal convictions. The option discussed in *Caldwell,* it would seem, readily may be reconciled with

pected that he will take into account the command in *United States v. Shepard,* 169 U.S.App.D.C. 353, 365, 515 F.2d 1324, 1336 (1975) where it was held that the Government properly may charge in the same indictment offenses against both the federal bank robbery statute and the District's armed robbery statute. The court was specific, however, that a defendant is not ultimately to be sentenced under two statutes proscribing essentially the same offense. Imposed upon the trial court is the duty, 169 U.S. App.D.C. at 365, 515 F.2d at 1336, "to select the counts on which to impose sentence when the jury returns verdicts of guilty under both statutes." [30] *And see* discussion in *United States v. Caldwell, supra.*

Passing to *United States v. Keys,* No. 73–1750, it will be recalled that Keys and Floyd had been charged on identical counts respecting the bank episode. Similarly they were found guilty, with sentences as to Keys as will appear in our footnote 1, *supra.* One conviction of bank robbery and one conviction of armed robbery will be vacated just as has been directed respecting Floyd, *supra.* Again, as in Floyd's case, the matter of re-sentencing will devolve upon the district judge pursuant to *United States v. Shepard, supra.*

Respecting Diggs, found guilty in No. 73–1667 of two counts of robbery under the D.C.Code with sentences to concurrent terms of 3 to 9 years on each count, one conviction will be vacated, and the

other is affirmed. His participation only as driver of the getaway car seems clearly to have led the jury to return not guilty verdicts as to all other counts.

Since it is not possible for us to penetrate the degree to which the sentences actually imposed on the respective appellants had been affected by considerations stemming from the counts we have vacated, we remand for possible re-sentencing in light of what here has been said.[31]

JUSTICE, District Judge (dissenting).

Although the information contained in the majority's statement of facts is highly suggestive of appellants' guilt, very little of it was available to the special agents at the time they conducted their armed approach to appellants' automobile.[1] The record unmistakably shows that, at the time he learned that a bank robbery had occurred, Special Agent Berry had only the following information concerning the appellants: (1) Diggs, whom he had arrested two weeks previously for bank robbery, had been released on bail. (2) Diggs' red-over-white Cadillac had been used to transport traveler's checks in the previous robbery. Further, Berry *believed* Floyd to have been responsible for the robbery of the same bank involved here, some four years previously. Nevertheless, when Special Agent Berry learned that a bank had been robbed in Northwest Washington, he immediately hypothesized that Floyd and Diggs were responsible. Proceeding directly to an area in

the direction of the court pronounced in *United States v. Shepard,* text *infra,* 169 U.S.App. D.C. 353, 365, 515 F.2d 1324, 1336 (1975).

30. "Thus, if the United States Attorney elects to combine local offenses with federal, he must do so in the knowledge that the trial will be conducted under federal evidentiary law." *United States v. Belt, supra,* 169 U.S.App.D.C. at 8, 514 F.2d at 844. He will know what evidence is available to establish the events in light of the evidentiary standard to be applied and thus to be guided in the exercise of his discretion as to the count upon which he expects to rest his case. So, too, the trial judge, fully advised of circumstances throughout the trial, can be expected to exercise his informed

discretion in selecting the conviction upon which to predicate sentence.

31. *Bryant v. United States,* 135 U.S.App.D.C. 138, 141, 417 F.2d 555, 558 (1969).

1. Agents of the F.B.I. "may . . . make arrests without warrant . . . for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 18 U.S.C. § 3052 (1969). The requirement of "reasonable grounds" is equivalent to the Fourth Amendment's requirement of "probable cause." *Henry v. United States,* 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

Northeast Washington where he knew Floyd and Diggs to "hang out", Berry and his partner waited for their suspects to show up in Diggs' red-over-white Cadillac automobile.

In the interval elapsing between his departure from the FBI office and his approach on the Cadillac occupied by the appellants, Special Agent Berry received little information to support his intuition that either Floyd or Diggs, or both, were involved in the robbery. In the five or more radio transmissions he and Special Agent Mowery listened to, one robber was apparently described, initially, as (1) between six feet, two inches and six feet, four inches in height, and (2) was finally described as six feet tall. The three police reports described the second robber, successively, as (1) "tall", (2) six feet in height and, again, (3) as six feet. The *contemporaneous* FBI radio reports, however, stated that the second robber measured approximately five feet, eight inches. Mowery recalled (and the transcript of the Police transmissions indicated) that the shorter robber was first represented as being six feet tall, but that this description was "refined" in later reports, so as to portray him as five feet, eight inches in height. Berry recollected, on the other hand, that "from the first transmission, one was tall and one was short, a Mutt and Jeff type of description." Berry further testified that he knew Floyd to be *shorter* than five feet, eight inches.[2]

When the Cadillac appeared, carrying three passengers, the driver began to park. The special agents pulled alongside the Cadillac, as it had "just about practically stopped". Drawing their guns before leaving their automobile, the special agents approached the Cadillac, told the driver to turn off the ignition, and ordered the occupants to keep their hands in sight. It is patent from the record that only the driver, Diggs, was clearly visible at the time the special agents came alongside the appellants'

automobile. Moreover, Berry recognized Floyd only as the agent exited from his own automobile with drawn gun, for, as previously discussed, the ambiguous radio reports had not provided additional information sufficiently accurate to identify the appellants. While reports correctly described the getaway car as a green Chevrolet, Berry testified that he was not misled by this description, since he had expected the robbers to change cars. Referring to Floyd and Diggs, Berry stated: "If they came back there in that car, I was going to stop them . . . ." Finally, it should be noted that neither agent testified to any suspicious activity on the part of Diggs or the other occupants of his automobile, as they drew near the agents and Diggs started to park his vehicle. It is against this factual background, then, that this case must be analyzed.

As one commentator has stated the problem, the "protean variety" of the situations with which the fourth amendment deals

> . . . is mindboggling; each situation bristles with considerations and demands that are "not easily quantified and, therefore, not easily weighed one against the other", and it seems "too dogmatic" and improperly insensitive to the practical complexities of life to categorize or pigeonhole situations for the purpose of enforcing a discipline of rules upon the richness of events. But if some discipline is not enforced, if some categorization is not done, if the understandable temptation to be responsive to every relevant shading of every relevant variation of every relevant complexity is not restrained, then we shall have a fourth amendment with all of the character and consistency of a Rorshach blot.

Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 375 (1974) (hereafter *Amsterdam*).

One of the most formless areas that the Supreme Court has sought to define

---

**2.** Of course, no description of Diggs was included in the reports since, as the "getaway man", he did not enter the bank.

is the reasonableness of the conduct of law enforcement officers when confronting individuals on the streets. In *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1949), the Court held that the stopping of a car containing suspected thieves was an "arrest", which was completed "when the officers interrupted the two men and restricted their liberty of movement."[3] Subsequent to *Henry*, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court sanctioned a "carefully limited search of the outer clothing" of a suspect, when "a police officer observes unusual conduct which leads him *reasonably to conclude* in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," *Id.*, at 30, 88 S.Ct. at 1884 (italics added); *i.e.*, a "stop and frisk" based on "reasonable grounds."

In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), a police officer seized a gun from the waistband of a person who sat in his parked car in a "high-crime" area at 2:15 a.m. In upholding the seizure, which was based on an informant's tip, the Court deemed it a "reasonable investigatory stop," citing *Terry*.[4]

*Terry*, it is said, creates three categories of street encounters between the law enforcement officer and the individual: simple conversation, which is always permissible; "investigatory stops", which require reasonable suspicion of criminal activity; and "arrests", requiring probable cause. Any attempt to expand this number, or to "recognize simply the principle that increasing degrees of restraint require increasing amounts of justification" must run aground on the fact that "any number of categories, however shaped, is too few to encompass life and too many to organize it manageably." *Amsterdam, supra*, at 376–377.

In my view, the facts of this case demonstrate neither probable cause for an arrest nor reasonable suspicion of criminal activity under the doctrines of *Terry* and *Adams*, respectively; hence, I agree with the majority that a characterization of the agents' actions, either as an arrest or as a "forcible stop", is unnecessary to the decision of this case.[5]

---

**3.** 361 U.S. at 103, 80 S.Ct. at 171. There is a wide gap between the above definition of an arrest and that given in *Brinegar v. United States*, 165 F.2d 512 (10th Cir. 1948):

> To constitute an arrest there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.

165 F.2d at 514, quoting from *Jenkins v. United States*, 161 F.2d 99, 101 (10th Cir. 1947). While *Henry* is still viable, *Sibron v. United States*, 392 U.S. 40, 67, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968), neither *Terry* nor any of its progeny have significantly bridged this gap. In *Terry* the Court held that a "stop and frisk", although a seizure, was not an "arrest", even though the stop clearly "interrupted the [three] men and restricted their liberty of movement." At the same time, however, the Court in *Terry* went "out of its way to avoid defining an arrest in terms which include the traditional element of a purpose to charge." *Amsterdam*, citing *Terry*, 392 U.S. at 16, 26, 88 S.Ct. 1868. In any event, as will be made clear below, I do not believe that the holding in this case should turn on a technical definition of the word "arrest."

**4.** 407 U.S. at 146, 92 S.Ct. 1921. It would appear that the police conduct in *Adams* fits more neatly into the "stop and frisk" mold of *Terry* than does the "dramatic excitement of drawn guns" herein presented. *Weed v. United States*, 340 F.2d 827, 829 (10th Cir. 1965).

**5.** Assuming, *arguendo*, that it is necessary to determine whether the agent's conduct constituted an "arrest", it should be emphasized that:

> [T]his is a decision on the rights of individuals and the duties of government, and not an abstract exercise in definition. In dealing with words there is always a temptation to allow them to become separated from their objective correlatives in the everyday world, and to treat them as if they have, or ought to have, one single simple meaning, unaffected by the contexts in which they occur and divorced from the world of things and events which give them their content and justification. * * * "Arrest" is just such a word * * *.

*United States v. Bonanno*, 180 F.Supp. 71, 77 (S.D.N.Y.1960).

Thus, rather than relying on a mere definition to determine whether a "stop" or an "arrest"

Special Agent Berry apparently formed an instantaneous and fixed expectation upon first hearing of the bank robbery; he testified: ". . . if they were the robbers, I expected them to come over that hill in that white Cadillac." Transcript, at 85. Although it is manifest that Special Agent Berry was correct in his reckoning, the odds which he computed could only have been assessed by him.[6] It would have been logically impossible for the necessary infer-

has transpired, the scope of the intrusion in question on the individual's *reasonable expectation of personal security* under the Fourth Amendment is and should be one of the principal considerations. *Terry,* supra, 392 U.S. at 17, 88 S.Ct. 1868, n. 14. In this connection, it should be taken into account strongly that, when an officer of the law stops an individual at gunpoint, a substantial danger immediately arises not only to the person of the individual stopped, but also to any bystanders and, indeed, to the officer himself.

It is obvious from all the facts in this case that the special agents' conduct in drawing their guns constituted "the ancient instinct of a peace officer to bring the apparent transgressor to stand—i. e. to place him in an effective state of arrest." *United States ex rel. Robinson v. Fay,* 239 F.Supp. 132 (S.D.N.Y. 1965), aff'd in open court (2d Cir. July 26, 1965), cert. denied, 382 U.S. 997, 86 S.Ct. 583, 15 L.Ed.2d 484. Special Agents Berry and Mowery both testified at the hearing on the motion to suppress that, if the appellants had attempted to leave the car or to drive away in it, the agents would not have let them do so. Transcript at 14, 88. While it is settled that the test of whether an arrest occurred is not what the arrested person thought at the time, it seems clear that a reasonable man, confronted with police orders delivered at the point of a gun would consider himself "arrested". *Coates v. United States,* 134 U.S.App.D.C. 97, 413 F.2d 371 (1969). Nor is the intention of the officers involved dispositive of the arrest issue, where the "seizure" involved is a substantial one. *U. S. v. Jones,* 352 F.Supp. 369 (S.D.Ga.1972), affd., 481 F.2d 1402 (5 Cir. 1973). The significance of the drawn guns is further demonstrated by those cases in which the government sought to sustain the stopping of an automobile by investigating officers on less than probable cause. While most courts have put their stamp of approval on such stops, based on the lesser standard allowed by *Terry* (see *e. g., United States v. James,* 147 U.S.App.D.C. 43, 452 F.2d 1375 (1971); *Young v. United States,* 140 U.S.App.D.C. 333, 435 F.2d 405 (1970); Note, *Nonarrest Automobile Stops: Unconstitutional Seizures of The Person,* 25 Stan.L.Rev. 865, 870 n. 30 (cases cited) (1973); but see *United States v. Bright,* 471 F.2d 723 (5th Cir. 1973) cert. denied, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148, the result has been different where guns were drawn to accomplish the stop. See *United States v. Strickler,* 490 F.2d 378 (9th Cir. 1974); *United States v. Troutman,* 458 F.2d 217 (10th Cir. 1972). The same resolution has been reached where automobiles were not involved. *United States v. Lampkin,* 464 F.2d 1093 (3rd Cir. 1972). But see *United States v. Richards,* 500 F.2d 1025 (9th Cir. 1974) (Hufstedler, dissenting, relied on *Strickler,* supra, in characterizing the conduct as an arrest. 500 F.2d at 1030). Thus, most courts apparently gag at the concept of a gunwielding "stop" based on anything less than probable cause.

"Focusing the inquiry squarely on the dangers and demands of the particular situation" at hand, and "in light of all exigencies of the case", *Terry,* supra, 392 U.S. at 18, 88 S.Ct. at 1878, fn. 15, I conclude that an arrest occurred when the special agents leveled their pistols at the appellants.

6. This may not have been the case, as the testimony adduced at the Motion to Suppress hearing contained at least one significant gap. When Berry was questioned on cross-examination as to the basis for his "hunch", the following exchange occurred:

Q. Yes. All right. And this suspicion was based upon your knowledge that Floyd had been released from the penitentiary and was in the Washington, D.C., area at the time, and that he had in the past been involved in bank robberies; and that during the month of January of the same year, you had occasion to be involved in an arrest of Tyrone Diggs regarding another bank robbery in the District of Columbia area?

A. That's correct. And I knew that—do you want some more?

Q. Yes, I would like to know exactly what was in your mind. That's what the Court has to rule on.

MR. ADELMAN: Your Honor, I object to these speeches.

MR. DIETZ: I am just trying to get the information, your Honor.

THE WITNESS: I forgot what I was going to say.

MR. DIETZ: You were about to volunteer something.

THE WITNESS: Yes, I know that. I was trying to think of what particular item I was going to mention.

THE COURT: Well, you have answered the question, Mr. Berry.

THE WITNESS: All right.

Transcript at 66–67.

ences to have been "drawn by a neutral and detached magistrate", *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1947).[7] There was no informer, no tip, and no description of the automobile or its occupants which matched Diggs as he drove up in the Cadillac. The site of the stop was approximately eight miles from the bank which had been robbed; a minimum of thirty-five minutes had elapsed since the robbery; and the occupants of the automobile were not engaging in any unusual activity. Moreover, since Diggs' car was coming to a stop, the exigencies appear to have been minimal. There was no indication (as there was in *Peters v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)) that a burglary (or any other crime) was imminent, or that the suspected perpetrators of the offense were likely to escape (as in *Bailey v. United States*, 128 U.S.App.D.C.

354, 389 F.2d 305 (1967)).[8] Further, the arrest of appellants was clearly "predicated on [Special Agent Berry's] personal observations and information," so that any "corporate information" possessed by the law enforcement agencies would have no bearing on probable cause.[9] *See: Smith v. United States*, 123 U.S. App.D.C. 202, 358 F.2d 833 (1966). In sum, no probable cause to support a warrantless seizure of the appellants was demonstrated by the government.

Since probable cause to arrest the appellants did not exist under the circumstances of this case, the next inquiry must be whether the special agents had "constitutional grounds to insist on an encounter, to make a *forcible* stop," of appellants. *Terry v. United States*, 392 U.S. at 32, 88 S.Ct. at 1885 (concurring opinion of Harlan, J.). *See: Williams v. Adams*, 436 F.2d 3035 (2d Cir. 1970)

---

7. Berry testified that his basis for driving to the 2200 block of M Street was:

   > More than a hunch. As I said, I had developed them as suspects. I was heading out there, not knowing they were the ones who had robbed the bank, but on the chance that they were. Transcript at 53.

   Special Agent Berry's general belief that Floyd and Diggs were bank robbers could not, of course, provide probable cause for their arrest. *Plazola v. United States*, 291 F.2d 56, 59 (9th Cir. 1961); overruled on other grounds, *Diaz-Rosendo v. United States*, 357 F.2d 124, *cert. denied*, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83.

8. Although the majority relied on *Bailey*, "[p]erhaps definitively, [to] terminate further present treatment" of the search and seizure issue, I find it clearly distinguishable from the present case.

   In *Bailey*, four police cars stopped an automobile containing four black males who were suspected of having just assaulted and robbed a pedestrian. An officer "approached appellant's car, apparently with his gun in hand, and ordered the occupants to sit still and keep their hands in plain sight." 389 F.2d at 307. In an opinion by Judge Wright, the majority, citing *Henry, supra*, accepted the government's concession that the arrest was complete when the officer approached the car and found that probable cause for an arrest was then present. Judge Leventhal, in a concurring opinion which accurately anticipated the holding in *Terry*, distinguished *Henry* on the ground that:

   > In *Henry*, the FBI was *routinely investigating* a theft from an interstate shipment of whiskey. When the agents stopped the car in which Henry was riding, *they knew who was in it*. In fact, they had no reason for stopping it other than to search at a time when there was clearly no probable cause. 389 F.2d at 314, n. 7. (Italics added.)

   Judge Leventhal found that, although there was no probable cause for an arrest, the investigative stop of the car was reasonable in light of the fact that it was leaving the jurisdiction and "once the occupants scattered it would be nearly impossible to reassemble them again." 389 F.2d at 314. Here, as in *Henry*, (1) the agents knew who they were looking for, and (2) the stop did not serve to relieve an exigent situation—the appellants were returning to the place where they "hung out", not fleeing from the jurisdiction. In addition, the stop in *Bailey* was predicated on specific and articulable facts (*i. e.*, that three black suspects were driving away from the scene of the assault and robbery in a 1954 blue Chevrolet), while the basis for the stop in the instant case was only the surmise of Special Agent Berry and vague, conflicting descriptions of the suspects from radio broadcasts.

9. The transcript of the Motion to Suppress hearing does not reflect any "corporate information" which was not broadcast to Special Agents Berry and Mowery over their radio.

(Friendly, J., dissenting), reversed by *en banc* vote without further argument, 441 F.2d 394 (2d Cir. 1971), in turn reversed, *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Thus we are called upon to determine: (1) whether there was unusual conduct on the part of appellants, observed by the special agents, which lead them reasonably to conclude, in light of their experience, that criminal activity might be afoot and that the appellants might be armed and dangerous, *Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. 1868; or (2) whether the special agents obtained information as to specific and articulable facts, supplied by another person or persons, which reasonably lead them to the same conclusions. *Id.*, at 21, 88 S.Ct. 1868; *Adams v. Williams*, 407 U.S. at 147, 92 S.Ct. 1921. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction."[10] *Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. at 1880.

It is unquestioned that, during the entire time the appellants were under the observation of the special agents prior to their being seized by the latter, the appellants' conduct was completely innocent in its outward aspects. It follows that the seizure of appellants was not warranted under the *Terry* doctrine.

The information upon which the officers acted in making their seizure of the appellants was restricted to that known to Special Agent Berry and to that obtained from radio transmissions from the F.B.I. and the Washington police. As already detailed, Berry's personally obtained information concerning appellants was wholly insufficient to identify

them as the perpetrators of the bank robbery; thus, his naked hunch that the appellants were the robbers, combined with the contradictory and confusing descriptions of the robbers received from the radio broadcasts, could not reasonably have served to cast any substantial suspicion on the appellants.

In *Adams v. Williams*, Justice Rehnquist, speaking for the majority, said:

> Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. 407 U.S. at 147, 92 S.Ct. at 1924.

In my opinion, the deficient nature of the information possessed by the special agents mandated further investigation by them before they undertook to seize appellants at gunpoint. As stated in *Terry*, the issue is "whether in all the circumstances of this on-the-street encounter, [the appellants'] right to personal security was violated . . ." 392 U.S. at 9, 88 S.Ct. at 1873. I would hold that, in the absence of such additional information as would have cast a reasonable suspicion on appellants, the precipitate actions of these special agents violated the fourth amendment's injunction that: "[t]he *right* of the people *to be secure* in their *persons* . . . against unreasonable searches and seizures, shall not be violated . . ." (Italics added.)

To my mind, the action of the majority in upholding the seizure and the subsequent search in issue here is extreme in its implications; that, though not intended as such, their decision on this point is the judicial equivalent of "burning down the barn to kill the rats in it." I suggest that, if the people are to con-

---

**10.** "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880, n. 18, citing numerous cases.

As the defendants argued below:

> But when an officer takes it upon himself, based on a hunch, based on good police work and good detective work to do what he did, then at the time he makes that stop, he has to have probable cause, because hunches come in bunches, but it doesn't always make you a winner.
> Transcript at 105.

tinue to enjoy their right to personal security, as confirmed by the fourth amendment, the judiciary must exercise restraint when considering "the careful balance that *Terry* sought to strike between a citizen's right to privacy and his government's responsibility for effective law enforcement", *Adams v. Williams*, 407 U.S. at 154, 92 S.Ct. at 1927 (Marshall, J., dissenting). I maintain that we must recognize that "[i]t is better . . . that the guilty sometimes go free", *Henry v. United States*, 361 U.S. at 104, 80 S.Ct. at 172, than to adopt a constitutional standard which will make it probable that "innocent citizens [will] be stopped, searched, and arrested at the whim of police officers who have only the slightest suspicion of improper conduct." *Adams v. Williams*, 407 U.S. at 162, 92 S.Ct. at 1931 (Marshall, J., dissenting).

Thus, I urge that the evidence obtained by the special agents after the accomplishment of their invalid seizure of appellants was "tainted" and, therefore, not admissible against the appellants at the trial of their case. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Sibron v. United States*, 392 U.S. 40, 67–68, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968).

### The Voir Dire Issue

The majority has correctly pointed out that, once the trial judge indicated he would not permit the proposed question regarding potential racial prejudice to be asked, appellant's trial counsel made no effort to preserve the issue. The record does not reflect whether it was the form

or the subject matter of the question which the court found to be objectionable. In the absence of an objection, the court was deprived of a final opportunity to reconsider the question tendered by defense counsel or to entertain an alternative question relating to racial prejudice. However, in *King v. United States*, 124 U.S.App.D.C. 138, 139, 362 F.2d 968, 969 (1966), this court held that

> the judge's refusal to put counsel's question to the jurors was plain error affecting substantial rights. Such errors may be noticed although they were not brought to the attention of the court. Rule 52(b) F.R.Crim.P.

In *King*, counsel had gone so far as to withdraw his requested question.[11] In any event, the majority here rests its holding on the merits, not upon a waiver theory.

The majority opinion suggests that since appellant's counsel did not exhaust his peremptory challenges, it "might be assumed that Floyd took his chances with the jury as selected." The majority's reliance on *Frazier v. United States*, 335 U.S. 497, 506, 69 S.Ct. 201, 93 L.Ed. 187 (1948), seems inapposite, however. I cannot agree that a criminal defendant should be charged with consenting to the composition of a jury, when he was deprived of an opportunity to elicit the very information which he deemed to be necessary for a reasonably informed utilization of his peremptory challenges.[12]

It cannot be doubted that we are dealing with a right that is of utmost importance to the integrity of the jury system, for the opportunity to ascertain potential

---

11. The question in *King* which the trial court refused to permit was:

    Would any member of the jury be prejudiced by the fact that the complaining witness is white and the defendants are Negro?

12. In *United States v. Bear Runner*, 502 F.2d 908, 911 (8th Cir. 1974), the court opined:

    Unquestionably one of the most effective means of ensuring impartiality is the voir dire proceeding during which questioning will expose any latent bias entertained by

prospective jurors. Such exposure is necessary if the parties are to be expected to exercise their challenges in an intelligent and informed manner. Justice White recognized this in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1964):

    The voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protracted.

*Id.* at 218–219, 85 S.Ct. at 835.

racial bias of veniremen is basic to the fundamental fairness of our system. Chief Justice Hughes observed in *Aldridge v. United States*, 283 U.S. 308, 315, 51 S.Ct. 470, 473, 75 L.Ed. 1054 (1931) that, "[n]o surer way could be devised to bring the process of justice into disrepute" than to "permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred."

The import of the majority's decision today—that only when a criminal defendant establishes that the potential for racial bias is accentuated by the circumstances of his particular case is he entitled to inquire into the veniremen's racial prejudices—does not seem to me to be in line with the spirit of the Supreme Court's holdings in *Aldridge* and *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Nor have other circuits imposed this requirement.[13] Moreover, in *United States v. Robinson*, 154 U.S.App.D.C. 265, 270, 475 F.2d 376, 381 (1973) (which was decided after *Aldridge* and *Ham*), Judge Leventhal, writing for the Court, discussed voir dire examination, as follows:

> When the matter sought to be explored on *voir dire* does not relate to one of those recognized classes, it is incumbent upon the proponent to lay a

foundation for his question by showing that it is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp.

Racial bias is one of those "recognized classes" of matters which, as the court thus implied, does not require a special foundation, as a condition precedent to the right to make inquiry.

Justice Marshall, dissenting from the denial of certiorari in *Ross v. Massachusetts*, 414 U.S. 1080, 1082–1083, 94 S.Ct. 599, 601, 38 L.Ed.2d 486 (1973), commented as follows:

> Nonetheless, on remand, the Massachusetts court read our decision in *Ham* as limited by the particular circumstances of that case—the trial of a civil rights worker in the South. The State court found that petitioner, unlike Ham, was not likely to be a "special target for racial prejudice" and, therefore, that the trial judge did not err in refusing to make the requested inquiry.
>
> This distinction is supported by neither logic nor precedent.

\* \* \* \* \* \*

> The *Aldridge* Court was not concerned with whether petitioner was unpopular in the community—a special target of prejudice—but rather with the potential racial "bias of the partic-

---

**13.** See *United States v. Robinson*, 485 F.2d 1157 (3rd Cir. 1973); *United States v. Booker*, 480 F.2d 1310 (7th Cir. 1973); *United States v. Powers*, 482 F.2d 941 (8th Cir. 1973), cert. denied, 415 U.S. 923, 94 S.Ct. 1426, 39 L.Ed.2d 479; *Kuzniak v. Taylor Supply Co.*, 471 F.2d 702 (6th Cir. 1972) (appellant was Austrian national); *United States v. Carter*, 440 F.2d 1132 (6th Cir. 1971); *United States v. Gore*, 435 F.2d 1110 (4th Cir. 1970); *Frasier v. United States*, 267 F.2d 62 (1st Cir. 1969).

The majority cites *United States v. Grant*, 494 F.2d 120 (2d Cir. 1974), cert. denied, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 as an example of other circuits which have taken similar positions on this issue. Nowhere in *Grant* does the court hold that special circumstances must be shown before a black criminal defendant is entitled to inquire into potential jury racial bias. Rather, the court finds that the error, if

any, in the trial court's refusal to ask a question intended to discover racial bias, was harmless error in view of the overwhelming evidence of guilt. The court did comment as follows:

> We believe it appropriate, however, to express our view that trial judges in the future should inquire into the subject of racial prejudice, if reasonably requested to do so by defense counsel.

494 F.2d at 122. In the footnote to this statement, the court observed that

> [A]ll six circuits to decide the question have held it to be error to refuse to permit reasonable inquiry into racial prejudice on voir dire, even absent the aggravating facts of *Ham* and *Aldridge*. (Citations omitted.)

Id., n. 6.

ular jurors who are to try the accused." [283 U.S.] at 314 [51 S.Ct. 470]. The Court did not rely on any particular circumstances to justify its requirements other than the fact that "the possibility of such prejudice [against Negroes] is [not] so remote as to justify the risk in forbidding the inquiry. *Ibid.* Nor did the Court purport to limit its holding to any region because the "question is not . . . the dominant sentiment of the community . . ." *Ibid.*

Naturally, the denial of certiorari in *Ross* is not in the nature of an affirmance, and is certainly not binding on us.[14] *See, e. g., Maryland v. Baltimore Radio Show,* 338 U.S. 912, 917–919, 70 S.Ct. 252, 94 L.Ed. 562 (1950). However, in my judgment, this pronouncement by Justice Marshall is an exceedingly persuasive interpretation of the *Aldridge-Ham* doctrine and—there having been no clear retreat by the Supreme Court from the *Aldridge-Ham* doctrine—should be the position taken by this Court. The majority's citation to one sentence from *Hamling v. United States,* 418 U.S. 87, 140, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1973) (in which potential religious bias was the subject of the requested jury inquiry), as an expression of support for its interpretation of *Aldridge* and *Ham* is not convincing. It should be recalled that, in *Hamling,* the district court "asked questions similar to many of those submitted by petitioners . . ." *Id.* at 139, 140, 94 S.Ct. at 2918. In the instant case, it is undisputed that no questions were propounded involving potential race prejudice.[15]

I share the majority's concern about mandating a new trial on this issue; defense counsel was indeed lax in pressing her request for inquiry into potential jury bias. But a reading of the Supreme Court's holdings in *Aldridge* and *Ham,* this Circuit's decisions in *King v. United States, supra,* and *United States v. Robinson, supra,* and the rulings of other Circuits on this subject makes it plain that we should not require a showing that a criminal defendant is a "special target of prejudice" before permitting his inquiry into jury bias.[16] While the trial court should be free to exercise its broad discretion over the form and number of questions to be asked, it should not be permitted to preclude inquiry into racial bias when a criminal defendant evidences a desire to satisfy himself in this regard.

I respectfully dissent.

---

**14.** The subsequent proceedings in the *Ross* case are of some import here. After the Supreme Court denied certiorari, Ross pursued his issue by way of application for the writ of habeas corpus. The United States District Court for the District of Massachusetts granted the application, and the decision was affirmed by the First Circuit in *Ross v. Ristaino,* 508 F.2d 754, (1 Cir. 1974). The court found it unnecessary to resolve the ambiguity which it believed the *Ham* decision to have created; that is, whether or not a criminal defendant must be "a special target of racial prejudice" before he is unqualifiedly entitled to inquire, on voir dire, into possible racial bias. Under either interpretation, the court found that Ross' due process rights had been violated. The court did, however, assert that it is reasonable to conclude that a juror who is prone to racial bias would not confine his impartiality to cases in which race issues are directly involved. 508 F.2d 756, n. 4. The court also cited several state cases which hold that *any*

black criminal defendant who requests a specific inquiry about racial prejudice is entitled to have some question asked. Id., n. 5.

**15.** The general question as to bias which was asked by the court did not remedy the trial court's error. *United States v. Robinson,* 466 F.2d 780 (7th Cir. 1972).

**16.** As Justice Marshall noted in *Peters v. Kiff,* 407 U.S. 493, 503, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83:

[I]f we assume that the exclusion of Negroes affects the fairness of the jury only with respect to issues presenting a clear opportunity for the operation of race prejudice, that assumption does not provide a workable guide for decision in particular cases. For the opportunity to appeal to race prejudice is latent in a vast range of issues, cutting across the entire fabric of our society.

These observations are equally sound as applied to the issue before this court.