**UNITED STATES of America**

v.

**Sterling R. PATRICK, Appellant.**

**No. 72–1481.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 18, 1973.

Decided March 28, 1974.

---

Marx Leva, Washington, D. C. with whom Lois J. Schiffer, Washington, D. C. (both appointed by this Court), was on the brief, for appellant.

Julius A. Johnson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Asst. U. S. Atty., and Herbert B. Hoffman, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee.

Before BAZELON, Chief Judge, WISDOM,* Circuit Judge for the Fifth Circuit and RICHEY,** United States District Judge for the District of Columbia.

PER CURIAM.

Appellant was charged with first degree murder and convicted of second degree murder accompanied by a jury recommendation that he receive psychiatric treatment. He was sentenced to a term of five to twenty years and the District Judge "[o]rdered that the Defendant is to go immediately to the Medical Center for Federal Prisoners in Springfield, Missouri."[1] Appellant's principal contention[2] on appeal is that the District Judge erred in responding affirmatively to a written question from the jury asking whether they could couple a recommendation of psychiatric treatment with a verdict of murder in the second degree. We find the Court's response plainly erroneous, and therefore reverse.

Uncontroverted circumstantial evidence showed that appellant fatally stabbed his foster mother in her home on the afternoon of December 8, 1970. On the day of the slaying, according to neighbors, noises came from the apartment of the deceased that sounded at one time like furniture being moved and at another like a baby crying. A seventeen year old boy who lived nearby testified that on the afternoon of the slaying as he walked past the residence of the deceased, appellant called to him from the deceased's apartment window and asked if the youth would telephone the police because appellant's mother was bleeding. The passerby ignored the re-

---

\* Sitting by designation pursuant to 28 U.S.C. § 291(a).

\*\* Sitting by designation pursuant to 28 U. S.C. § 292(a).

1. While the court "[o]rdered" appellant to Springfield, Missouri, in effect he was making a recommendation since the Attorney General of the United States has sole discretion as to where a federal prisoner serves his sentence. 18 U.S.C.A. § 4001(b)(2) (1973 Supp.)

2. Appellant also contends that the denials of his motions for a bifurcated trial, raised both before and during trial, were in error. Since appellant's only significant defense, however, was insanity, we find that there was no "prejudice to the defense on the merits due to the failure to bifurcate." Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d 281 (1967). See United States v. Bennett, 148 U.S.App.D.C. 364, 460 F.2d 872 (1972). Our disposition makes it unnecessary to consider any other issues raised by appellant.

quest, but returned some fifteen minutes later to find Mr. Timothy Wise, sixty-year old husband of the deceased, entering the front door of the home. Mr. Wise testified that once inside he encountered appellant, who had not lived at home for several months. Appellant ran down the stairs toward Wise and told him that, "Moma is dead. I don't know who killed her." (Tr. 91). When the police arrived they entered the apartment with Mr. Wise and found the deceased lying on the floor clad only in panties with her slip wrapped around her waist, her brassiere under her body and a pillow covering her head. Mr. Wise and appellant were taken to the police station for questioning, and several hours later, after further police investigation at the apartment, appellant was arrested and given Miranda warnings. Appellant then made a statement and at one point told police that, "I feel that I killed her but I don't remember how it happened." (Tr. 215–216). One of the detectives who took appellant's statement recalled that appellant was extremely nervous during the first few hours at the station and interrupted his statement frequently in order to drink coffee or go to the bathroom.

The theory of the defense was that as a result of taking LSD on the date in question, appellant lacked the intent requisite for first degree murder. Several doctors testified that appellant told him he had taken three tabs of LSD on the day of the offense and that he had been using heroin and barbiturates steadily since 1967. Dr. Robert H. Robertson, a psychiatrist at St. Elizabeths Hospital, had examined appellant eight times pursuant to a court-ordered study. He also reviewed psychological reports and interviews with appellant that had been made during three prior admissions to St. Elizabeths between 1967 and his arrest. On that basis Dr. Robertson testified that appellant had a drug dependency and that if "he had LSD that day . . . and had an LSD effect . . . then I would say it was connected" to

the crime. (Tr. 370). He also stated that appellant told him he had hallucinations which Dr. Robertson concluded were drug-related.

Dr. Robertson also testified that he was of the opinion that appellant suffered from sexual deviation, taking the form of both homosexuality and transvestism. He outlined appellant's history of attempting to pass himself as a woman and suggested that "it is . . . almost approaching [delusions], that he not only dresses up as a woman but he really tells people he is a woman and calls himself Shirley." (Tr. 178). In conclusion, he stated:

> "We believe that homosexuality often occurs in men who have abnormal attachment to the woman who raised them, even to the point of some incestuous wishes on the part of the individual. Frequently homosexuality is associated with a latent [sic] or overtones of incestuous feelings. The fact that she was naked would make me wonder whether there might not have been some incestuous feelings at that time of this slashing of her 47 times." (Tr. 288). (See also Tr. 321).

According to Dr. Robertson the slaying, if indeed it was committed by appellant, was a "sickness in itself." (Tr. 288).

The government presented the testimony of Dr. John Davies, a private psychiatrist who examined appellant on one occasion sixteen months after the slaying. Dr. Davies testified that appellant was "not suffering from any mental disease or defect other than sexual deviation" at the time of the murder, (Tr. 397) and designated appellant's sexual deviation as a "personality disorder." Dr. Davies concluded that appellant's sexual deviation consisted of a life-long pattern of behavior that did not lend itself to sudden interruption which would result in a failure to control his behavior on the date of the slaying. With respect to whether appellant may have been under the influence of LSD at

that time, Dr. Davies explained that he saw no evidence of such condition, apart from appellant's claims.

After being instructed at length on the insanity defense, the jury deliberated throughout the afternoon of one day and for several hours the next morning before sending a note to the court informing it that "the jury is unable to reach a verdict—ten find [appellant] guilty, and two not guilty by reason of insanity". (Tr. 526). The court discussed this note with defense counsel and appellant, advising them that the jury's spontaneous announcement of its numerical division required its discharge unless the defense agreed that the jury should continue to deliberate.[3] Upon the recommendation of counsel, appellant consented to the jury continuing in its deliberations. Thereupon the Court called the jury back into the courtroom and asked them to continue deliberating.[4]

Within an hour the jury sent another note to the court stating,

"The jury would like to know if they can make a recommendation of psychiatric treatment for the defendant along with a verdict of murder in the second degree?" (Tr. 531).

In the presence of counsel, the judge read the jury's question, and his suggested response which was,

"Yes, if your verdict of murder in the second degree is beyond a reasonable doubt as to all elements and unanimous." (Tr. 531).

Neither counsel objected and the court commented that, "it looks as though we have a verdict." (Tr. 532). He then sent for appellant and told him of the jury's most recent query and the court's response. Appellant said nothing. Shortly thereafter the Court's answer was sent to the jury. Fifteen minutes later they returned a verdict of "guilty of murder in the second degree", stating that "the jury recommends that the Defendant receive psychiatric treatment".

## II

In the circumstances of this case, the District Judge erred when he told the jury that it could recommend psychiatric treatment if it returned a guilty verdict. It is well established in this jurisdiction that the jury's only function is to assess guilt or innocence on the basis of their independent view of the evidence. Sentencing decisions, on the other hand, are within the exclusive province of the court and it is the court's responsibility to insure that these functions are kept separate. As long ago as 1911 in Miller v. United States, 37 U.S.App.D.C. 138, 143, we indicated:

"it is error for the court to put before the jury any considerations outside the evidence that may influence them, and lead to a verdict not otherwise possible of attainment. The deliberations of the jury should revolve around the evidence before them, and should be uninfluenced by other considerations or suggestions. The moment other suggestions or considerations find lodgment in their minds, that moment they stray from the path which the law has marked out, and

---

3. See Mullin v. United States, 123 U.S.App. D.C. 29, 356 F.2d 368 (1966); United States v. Smoot, 150 U.S.App.D.C. 130, 463 F.2d 1221 (1972); Williams v. United States, 119 U.S.App.D.C. 190, 338 F.2d 530 (1964). *Cf.* Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1920). We leave open the question of whether it was appropriate for the trial court to inquire whether appellant wanted to "waive" his right to a mistrial, or whether the fair administration of justice automatically requires a mistrial when the jury reveals its numerical division. We note, how-

ever, that the court did attempt to ameliorate any prejudice by instructing them that the court was "not in any way attempting to indicate how you should ultimately resolve this case as to the degree of homicide, as to the insanity, or as to anything else."

4. The court gave the "Allen" charge to the jury in accordance with the model charge set forth and adopted by this court for use in this Circuit in United States v. Thomas, 146 U.S.App.D.C. 101, 449 F.2d 1177, 1187 (1971).

their verdict, in consequence, does not rest solely upon the evidence. It as a colored and false verdict. When we consider that the existence of a reasonable doubt entitles a defendant to an acquittal, and that a very slight circumstance may affect the verdict, the danger from putting before the jury anything that may improperly influence their deliberations becomes more apparent."

In particular, in a case such as this one where the sole issue is the question of criminal responsibility, the potential for undermining a jury verdict by allowing a recommendation of psychiatric treatment is obvious. The rationale underlying the insanity defense is that the jury —as a representative of the community's *moral* conscience—is to decide whether a person was sufficiently able to control his behavior so that he may justly be held responsible for committing an antisocial act.[5] Despite recommendations by several commentators and judges,[6] this court has steadfastly refused to abolish the insanity defense and replace it with a post-conviction inquiry into whether "treatment" or "punishment" is appropriate.[7] Having refused to eliminate this moral component, we see no justification in diminishing it by permitting the jury to focus on disposition rather than blame. To allow a jury recommendation of treatment would do precisely that.[8]

Relying on Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), the government argues that the court's response was appropriate since this case involved the insanity defense. In *Lyles* we said it was proper for a trial court to instruct the jury as to the general consequences attaching to a verdict of not guilty by reason of insanity since jurors "are aware of the meanings of verdicts of guilty and not guilty. . . . But a verdict of not guilty by reason of insanity has no such commonly understood meaning." 254 F.2d at 728. We indicated that explanation of the insanity verdict was a narrowly limited exception to "the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict." Id. In this case, the jury was properly instructed under *Lyles* with respect to the effect of a finding of not guilty by reason of insanity. Their query went to the consequences attaching to a verdict of *second degree murder*, not to a verdict of acquittal by reason of insanity. Hence, *Lyles*, itself, required the court to refuse to answer the question and instruct the jury that they have "no concern with the consequences of [their guilty] verdict."

The government also contends that even if the court's response was erroneous, the error was harmless because the jury had reached a verdict of guilty before it inquired whether it could tack

---

5. See Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665 (1945) ; Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954) ; United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

6. See Mr. Justice Weintraub's concurring opinion in State v. Lucas, 30 N.J. 37, 82, 152 A.2d 50, 74 (1959), and his remarks before the Annual Judicial Conference of Second Judicial Circuit, 37 F.R.D 365, 369 (1964) ; Katz and Goldstein, Abolish the "Insanity Defense"—Why Not?, 72 Yale L.J. 853 (1963) ; T. Szasz, Law Liberty and Psychiatry, 123–137 (1963). Morris, "The Dangerous Criminal," 41 U.S.C.L.Rev. 514 (1968).

7. United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

8. Indeed, the court's response was not only inappropriate, it was also incomplete. The court did not tell the jury that even if they did make a recommendation of treatment he was not bound by it, and that even if he did follow it, treatment was not assured since the Attorney General has ultimate power to decide where a prisoner is to be incarcerated, (see Note 1, *supra*) and the court has no way to insure that a prisoner will receive any particular form of rehabilitation or treatment. Compare United States v. Glick, 463 F.2d 491 (2nd Cir. 1972) ; United States v. Louie Gim Hall, 245 F.2d 338 (2nd Cir. 1957).

on a recommendation for treatment. While this view is not inconsistent with the record, an equally plausible hypothesis—especially in light of the earlier note that the jury was divided ten to two—is that the second note was aimed at facilitating a compromise verdict by soliciting information that would assure those dissenting jurors, who would not otherwise have acquiesced, that appellant would receive treatment.[9]

It should be unnecessary for us to speculate from the "inescapable remoteness of appellate review",[10] which of these possibilities in fact occurred. When a judge is asked whether the jury can make a recommendation of leniency or treatment, he should inform the jury that:

> "It is the jury's responsibility to determine guilt or innocence on the basis of the evidence that has been presented. You are not to consider the question of punishment in arriving at your verdict. If you find the defendant guilty the Court will determine the appropriate sanction." [11]

If this approach is followed, we will not find it necessary to guess blindly as to the effect of an erroneous instruction on dissenting jurors once they return to the jury room.

Reversed and remanded for a new trial in accordance with this opinion.

---

9. The question of whether a jury's consideration of a sentencing recommendation has improperly interfered with its exclusive function to determine guilt or innocence often arises where the jury seeks permission to recommend leniency or where the court mentions sentencing in the charge. See Miller v. United States, *supra;* United States v. Glick, 463 F.2d 491 (2nd Cir. 1972) ; United States v. Louie Gim Hall, 245 F.2d 338 (2nd Cir. 1957) ; Lovely v. United States, 169 F.2d 386, 392 (4th Cir. 1948), cert. denied, 338 U.S. 834, 70 S.Ct. 38, 94 L.Ed. 508 (1949) ; Demetree v. United States, 207 F.2d 892, 896 (5th Cir. 1953) ; United States v. Davidson, 367 F.2d 60 (6th Cir. 1966).

Compare Fall v. United States, 60 U.S.App. D.C. 124, 49 F.2d 506 (1931) ; Gariepy v. United States, 220 F.2d 252, 262 (6th Cir. 1955), cert. denied, 350 U.S. 825, 76 S.Ct. 53, 100 L.Ed. 737 ; United States v. Parker, 103 F.2d 857, 863 (3rd Cir. 1939) ; United States v. Krulewitch, 167 F.2d 943, 950 (2nd Cir. 1948), reversed on other grounds.

10. Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965).

11. See generally, Fall v. United States, *supra;* United States v. Louie Gim Hall, *supra;* United States v. Glick, *supra;* Compare United States v. Davidson, *supra.*