**Alvin M. HEADSPETH, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 05–CF–16.

District of Columbia Court of Appeals.

Argued Oct. 5, 2006.

Decided Nov. 9, 2006.

Marie L. Park, San Francisco, CA, appointed by the court, for appellant.

Sharon A. Sprague, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and KING, Senior Judge.

REID, Associate Judge:

A jury found appellant Alvin M. Headspeth guilty of possession of an unregistered firearm (D.C.Code § 7–2502.01 (2001)).[1] Mr. Headspeth asserts that the trial court committed plain error in reinstructing and polling the jury, and that the error seriously affected the fairness and integrity of his trial. Because we agree, we are constrained to reverse the trial court's judgment, and to remand this case to the trial court for a new trial.

## FACTUAL SUMMARY

The government presented the testimony of Metropolitan Police Department ("MPD") officers showing that on October 17, 2003, MPD officers were on duty outside Cardozo High School in the Northwest sector of the District of Columbia during the school's homecoming football game. Officers Christopher Dove, David Casetta, and another officer were in a marked car in the 2400 block of 13th Street, N.W. Someone yelled that there was going to be a fight and there was a reference to a gun. They saw two persons move toward the rear of a black Ford Expedition vehicle. From the police car, Officer Dove "watched one of the individuals reach into his jacket, pull out a black and silver object, and hand it to another individual," later identified as Mr. Headspeth. Officer Dove clarified his statement, saying that "the back of the truck ... blocked my view of the object when [the individual] passed it to Mr. Headspeth," and he did not actually "see [anyone] receive the object...." However, Officer Dove observed Mr. Headspeth open the back door of the Ford Expedition, "lean" into a baby seat, "go[] under" the baby seat, and then close the back door.

---

1. The jury was unable to reach a decision on the offense of carrying a pistol without a license, but returned a not guilty verdict on the charge of possession of ammunition.

Later, Officer Casetta reached under the baby's car seat and "felt the top of a gun."

At the time of the incident, Officer James Culp was off-duty, but stopped by Cardozo High School to watch part of the football game. As he was parking his car, he saw "a large crowd ['between 25, 40 people'] coming out of ... the entrance gate." Those in the crowd were "hollering and screaming, and ... there was some type of commotion." Officer Culp "heard someone say, police, police, ... looked in [his] side view mirror, ... [and could see, []] the lower torso of two people." He "saw one hand exchange what appeared to be a weapon to another, and [the recipient] stuck it in his waistband, went to the car [the Ford Expedition] either behind [him] or a car behind that, opened the door, and stuck it in the truck." MPD Officer Valerie Campbell, a crime scene technician took photographs and retrieved the gun. She was unable to remove any usable prints from the gun.

Mr. Headspeth testified that after attending the football game, he proceeded toward his black Ford Expedition truck. His girlfriend and his daughter were with him, as well as another child. There was a crowd (about 20–30 people) and "a lot of commotion" broke out—"fighting or people [were] arguing." He used his remote control—his "alarm key" so that "the crowd would move away from [his] truck" to unlock his vehicle. When he reached the vehicle, the back door was open and he saw a gun that he had never seen before "on top of" his little girl's car seat. He put the gun under the car seat. When asked why he did that, Mr. Headspeth answered: "Because I was thinking real fast and I didn't want to ... tell the police that I got a gun over here. I was trying to hide it

and I was going to take my daughter and just dump it away." On cross-examination, Mr. Headspeth asserted: I knew I had [the gun]. I had to get rid of it. I wasn't going to say, hey, "there's a gun while all the fighting was going on." The police "grabbed" him, and after his arrest, he gave a statement to the police declaring: "I was putting nothing in the back seat of my car; I was trying to hide an unknown gun." Another defense witness, Mr. Headspeth's girlfriend, stated that she did not see Mr. Headspeth with a gun in his hands.

Not long after the jury began its deliberations, it sent two notes to the trial judge. One read: "Does presence of gun in car meet legal definitions of carrying and possession in charges one and two?" [2] The second note contained three questions: (1) "Can charges be reduced from felonies to lesser felonies or misdemeanors?" (2) "Can sentencing be limited to community service?" (3) "How can the jury recommend lightest sentence possible under the law?" The trial judge and both trial counsel discussed and agreed on how to respond to the jury's notes. As for the first note, the trial judge repeated and modified his instruction regarding "the concept of carrying," and on the notion of "possession" gave the instruction on actual and constructive possession. With respect to the second note, the judge repeated the instruction that "possible punishment is not relevant," but "add[ed]" the following:

[I]f the jury reaches a verdict, the jury may make a separate recommendation as well. Please understand that the verdict is the only official decision of the jury. If the jury wants to make a separate recommendation after the verdict, you may do so on a separate piece of

---

**2.** Charge one concerned the charge of carrying a pistol without a license, and charge two,

possession of unregistered firearm.

paper. The Court will consider the recommendation, but it is not binding on the Court.

In the late afternoon of the first day of deliberations, the jury again sent two notes to the trial court. The first read: "The jury has reached verdicts on charges # 2 [possession of unregistered firearm] and # 3 [possession of ammunition], but not yet # 1 [carrying a pistol without a license]." The trial judge announced that he would take the verdicts on counts two and three. With regard to the charge of possession of unregistered firearm, the jury foreperson announced:

> Guilty technically with an addendum. The jury unanimously agrees the defendant technically violated the law. However, several jurors believe he did not violate it in spirit. Their concerns are to be reflected in an attached statement[] whose language has yet to be agreed upon ... [t]hat we would ask the Court to read at the end of the trial proceedings.

The jury foreperson further indicated that the jury found Mr. Headspeth not guilty of possession of ammunition. After conferring with counsel, the trial judge polled the jury as to whether the jurors agreed with the verdict. Jurors number 1 through 5 responded, "[y]es," to the question, "do you agree with the verdict announced...."

Juror No. 6 responded, "[y]es, with the notation as is altered." When the judge advised that he would "discuss that" and stated that "the verdict [on charge 2] is guilty," the juror said: "Technically, yes." The judge replied: "Not technically. The verdict is guilty. Do you understand, sir?" The juror began to answer: "We wrestled long and hard about that and—." The judge stated:

> Sir, let me interrupt you, please. As I said in my note to the jury [], that the only official decision of the jury is on the verdict form. And if you wanted to make a separate statement above that, the jury was free to do that or an individual is free to do that. I don't want to invade the jury's deliberations. So that's why I interrupted you here.
>
> So there is not a technical guilt. He is guilty or not guilty. So I want that to be clear with the entire jury. As I said—and I appreciate that you are all lay people and this is new to, I'm sure, most if not all of you. So the only verdict that's official is the official verdict form. Everything else on here is advisory. It's just what individuals may think. And, as I said before, that's something I will consider at the time of sentencing. But that is the—that's the law.
>
> So I'm going to start this again so that everyone is clear. I've tried to make it as clear as I can, that the verdict, the only official verdict, is guilty or not guilty.
>
> The jury has reached a verdict of guilty as to count two, possession of an unregistered firearm and not guilty as to count three, possession of ammunition.
>
> So I'm going to restate it, just redo it again, with my instructions that that's the only verdict that can be accepted by the Court.

Another juror then asked to speak, and began—"We spent much of our time wrestling with whether—" at which point the judge cut him off and said:

> Sir, sir, I really am going to have to— and please, I'm not being rude here. But I just want you to appreciate that if you have a question or a note, I suppose you can send a note again through your foreperson. The reason I cut you off is that the law is very protective of the jury's deliberative process, and I'm doing that out of respect for the jury's

deliberations, not in any way to be—to cut you off or [to be] insensitive in any fashion.

At that point, defense counsel asked for a bench conference, and expressed concern that "at least Juror Number 6 has some reservations about what he did," and other jurors might not have "underst[oo]d what the Court was trying to get across to them." The judge mentioned the possibility of having the jurors return the next day and eventually told counsel:

> I'll consider sending another verdict form back and having them—I want to think about this some. I just think that we are not in a posture now. I think the reason needs to be clearer. I have done this twice before. This is not the first time that something like this has come up in a civil and a criminal case. So I don't think there's anything wrong with it, but I think we need the unequivocal guilty. And that's why I said a separate paper.

The judge then addressed the jury in open court, indicating that he would "recess [their] deliberations right now" until 9:30 a.m. the following morning, would send to them a new verdict form, and would "ask the jury to deliberate and fill out that verdict form as the jury believes is appropriate." He also repeated much of what he had said previously in response to Juror Number 6's statements, including the need for any recommendation to be made on a separate sheet of paper, and he declared: "I will, no matter what the verdict is, obviously take into consideration what the jury has said or [what] individuals on the jury say."[3]

The following morning, shortly before 11 a.m., the jury sent a note to the judge indicating that it had reached unanimous verdicts on the unregistered firearm and the possession of ammunition charges, but stating: "We believe we cannot reach agreement on charge one." The trial court took the unanimous verdicts in open court, decided not to accept the jury's sentencing recommendation "until the conclusion of the case," and polled the jury at defense counsel's request. All of the jurors agreed that the verdict on count two was guilty, and not guilty on count three. Defense counsel asked for a mistrial as to count one, which was not granted. The judge asked the jury to resume its deliberations, after hearing the views of counsel, including the prosecutor's "belief ... that [the jurors had] spent most of the time discussing how to recommend to the [c]ourt certain issues."

Around noon, the jury requested a transcript of the testimony of Officer Culp and Mr. Headspeth. After discussing the note with both counsel, the judge sent a return note to the jury advising that a transcript could not be provided until Monday, and instructing them to resume deliberations. Just prior to 1 p.m., the judge received another note stating, in part:

> To be clear, we do *not* require transcripts, as jurors assiduously compared notes on the requested testimony. We are deadlocked on charge 1, and very unlikely to reach unanimity required for a verdict. [ (Emphasis in original.) ]

Defense counsel requested a mistrial on count one, and the government asked for a *Winters* instruction.[4] The judge gave the

---

**3.** In addition to adding the word "technically" on the initial verdict form, after checking "guilty" for the possession of unregistered firearm charge, the jury added the following note: "The jury unanimously agrees the defendant technically violated the law; however, several jurors believe he did not violate its spirit. Their concerns are reflected in the attached statement."

**4.** *Winters v. United States*, 317 A.2d 530 (D.C. 1974) (en banc).

*Winters* charge. Thereafter, around 3 p.m., the jury inquired whether its verdicts on charges two and three would stand if it could not reach a verdict on count one. The trial court returned the note to the jury room, with a one word written response, "Yes." About 4 p.m., the jury again sent a note advising that it could not reach agreement on count one. The trial court, without objection, decided to grant the defense motion for a mistrial on that count, and accepted the final note from the jury which read:

*Jury Recommendation*

We, the jury, believe that although we have found the defendant guilty of possession of unregistered firearm as a *technical* matter, we believe there are a number of facts and circumstances that Your Honor should take into account when imposing sentence.

1. The defendant did not possess the gun for more than a momentary time.

2. This was a confusing, quick period of time, where the defendant had to make instant, difficult decisions.

3. Because the defendant was immediately arrested, he had no time for second thoughts or later giving the gun to the police.

Under these circumstances, based on available information, in the absence of other factors, we recommend leniency in sentencing, with some jurors expressly recommending community service.

The trial judge told the jury: "I will certainly consider the jury's recommendation at the time of sentencing."

## ANALYSIS

### *The Jury's Second Note*

Mr. Headspeth first contends, in essence, that the trial court committed plain error in responding to the jury's second note containing three questions: (1) "Can charges be reduced from felonies to lesser felonies or misdemeanors?" (2) "Can sentencing be limited to community service?" (3) "How can the jury recommend lightest sentence possible under law?" Specifically, he argues that "[t]he court advised the jury that it could make a sentencing recommendation when it was clear that after an hour of deliberations, jurors were overly focused on punishment;" that "the court gave the jurors an 'easy out' to quickly reach a compromise verdict;" and that "the court never clarified to the jury that a sentence of community service was not possible and that a reduction to a misdemeanor offense was also not possible." Hence, Mr. Headspeth maintains, "[t]he clear implication ... was that the court might give [him] the lightest possible sentence, community service." The government asserts that counsel for Mr. Headspeth "explicitly agreed with the approach employed by the court, even suggesting specific language to be used" in responding to the jury's three questions, and therefore, Mr. Headspeth "should not be permitted to switch courses on appeal and his claim of error should be barred."

### *Applicable Legal Principles*

 Under Super. Ct.Crim. R. 30,[5] "objections to reinstructions must be made before the jury resumes deliberations." *Robinson, supra,* note 5, 649 A.2d at 586 (citing *Deneal v. United States,* 551 A.2d

---

5. Super. Ct.Crim. R. 30 provides in pertinent part that "no party may assign as error any portion of the charge [to the jury] or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that

party objects and the ground for the objection." This rule "is equally applicable to reinstructions given by the trial court once the jury has begun its deliberations." *Robinson v. United States,* 649 A.2d 584, 586 (D.C. 1994) (citation omitted).

1312, 1316–17 (D.C.1988)). "[A]n appellant's failure to comply with Rule 30 'inevitably triggers plain error review.'" *Id.* (quoting *Allen v. United States,* 495 A.2d 1145, 1151 (D.C.1985) (en banc)). "Thus, plain error review makes noncompliance with Rule 30 particularly costly 'by necessitating a greater showing of harm than that required to obtain relief under the harmless error standard.'" *Id.* (quoting *Allen, supra,* 495 A.2d at 1151). "Under the plain error standard, the error must be (1) obvious or readily apparent, and clear under current law; and (2) so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Jones v. United States,* 779 A.2d 357, 360 (D.C.2001) (citations and internal quotation marks omitted). "This court will reverse under the plain error standard 'only in exceptional circumstances where a miscarriage of justice would otherwise result.'" *Id.* (citation omitted); *see also Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Mr. Headspeth did not raise any objection to the trial court's proposed reinstruction to the jury during the discussion of the jury note containing the three referenced questions. Indeed, his counsel expressed the view that as to the first question, "Can charges be reduced from felonies to lesser felonies or misdemeanors," "the lesser included would be the attempt [carrying a pistol without a license]." As to questions 2 and 3, the trial judge stated that one way to approach the matter "is just to say essentially none of your business, as I've already told you and not to consider it." However, the judge mentioned a different approach that he could use, "if both parties agree to it. If [both parties] didn't [agree], then I wouldn't" take this approach. The judge proposed to tell the jury:

> [T]he jury's function is not to determine sentence. That's my responsibility. The jury's function is to determine the verdict in this case. If you reach a verdict in this case, that is the official judgment of the Court. However, if you wanted to make a recommendation in addition to the verdict on a separate piece of paper, that's something the Court could consider in the future, but it's not bound by it.

After the prosecutor voiced no objection to the trial judge's proposed approach, defense counsel stated: "no objection on behalf of the defendant." The judge then reviewed his approach, saying that he would re-read the jury instruction indicating that "possible punishment is not relevant," read the instruction concerning "communications between court and jury during jury deliberations," advise the jury "that the verdict is the only official decision of the jury," and state that "[i]f the jury wants to make a separate recommendation after the verdict, [it] may do so on a separate piece of paper." Defense counsel asserted: "I think they should be also told that the Court would consider it but it's not binding on the Court." The trial judge replied: "That's fine." The judge then said: "I want to make clear again that, if the parties ask me just to give ["the possible punishment not relevant" instruction], "I'm prepared to do just that, and that's clearly an answer to their question." The judge continued by explaining his views about a jury recommendation, and then asked if the parties agreed with his proposed approach. Both the prosecutor and defense counsel articulated no objection. The court, as proposed, reinstructed the jury on the note containing the three referenced questions.

The trial court specifically repeated its instruction that "possible punishment is not relevant" to the jury's deliberations. The court also advised the jury concerning a possible "separate recommendation after the verdict," provided it was "on a separate piece of paper." The court added the language suggested by defense counsel: "The Court will consider the recommendation, but it is not binding on the Court." Under these specific circumstances, we discern no plain error to this point of the proceedings. *See Jones, supra,* 779 A.2d at 360.

### The Initial Verdict Form

Mr. Headspeth also claims that in light of "an initial verdict form ..." [which contained] a written notation that [he] was only "technically guilty" and that "several jurors did not believe he had violated the 'spirit' of the law," the trial judge's "instruction that the jurors were to redo their verdict form to comply with the law was highly coercive by itself when one considers the fact that a juror had expressed uncertainty at polling." In addition, he argues that "[t]he polling procedure was ... coercive," and "the entry of the verdict on count 2 constituted plain error." He contends that he suffered prejudice to his substantial rights. The government maintains that the trial court did not commit plain error because "the 'inherent coercive potential' presented by Juror Number 6's apparent equivocation during the initial jury poll was 'negligible,'" and because the trial judge properly "halted the poll of the jury and sent the jurors back to continue their deliberations." These arguments require us to focus on the legal principles governing a unanimous jury verdict, the role of the jury—if any—concerning punishment of the defendant in the event of a guilty verdict, and the polling of members of the jury regarding their agreement with the jury verdict.

### Applicable Legal Principles

In *Matthews v. United States,* 252 A.2d 505 (D.C.1969), we highlighted a quote from a 1957 Wisconsin case which places the requirement of a unanimous jury verdict in perspective:

Under the present administration of justice in this country, it is impossible to over estimate the importance of preserving the trial by jury in all its purity and integrity. The life, liberty, reputation and property of our citizens are constantly committed to the decisions of a jury. Hence, the necessity for the great vigilance and care which are exercised by courts of justice, to secure a free, voluntary, conscientious, and unanimous verdict.

*Id.* at 506–07 (footnote omitted). The role of the jury in reaching a unanimous verdict on guilt or innocence is guided by a fundamental principle: "[T]he jury is to determine guilt or innocence on the evidence before it and should not consider the possibilities of punishment in its deliberations because sentencing is exclusively within the duties of the court." *Brown v. United States,* 554 A.2d 1157, 1160 (D.C.1989) (citations omitted). "[I]t is incumbent upon the trial judge to restrain [the jury]" from considering the possibilities of punishment as it seeks a verdict on guilt or innocence. *Alston v. United States,* 383 A.2d 307, 314 (D.C.1978) (citing *United States v. Patrick,* 161 U.S.App. D.C. 231, 494 F.2d 1150 (1974)). *Patrick* noted that: "The question of whether a jury's consideration of a sentencing recommendation has improperly interfered with its exclusive function to determine guilt or innocence often arises where the jury seeks permission to recommend leniency or where the court mentions sentencing in the charge." 161 U.S.App. D.C. at 236, 494 F.2d at 1155 n. 9 (citations omitted).

When it appears possible that a focus on punishment may have interfered with the jury's duty to determine guilt or innocence, the role of the trial judge in ensuring the integrity of the jury's unanimous verdict is pivotal. Ensuring that integrity may hinge on the trial court's polling of members of the jury once a verdict is announced. "The jury poll is the primary device for uncovering the doubt or confusion of individual jurors." *Crowder v. United States*, 383 A.2d 336, 340 (D.C. 1978) (citing *Johnson v. United States*, 360 A.2d 502, 505 (D.C.1976)) (other citation omitted); *see also Green v. United States*, 740 A.2d 21, 25 (D.C.1999). The "purpose [of the jury poll] is to determine with certainty that every juror approves of the verdict as returned, and that no juror has been coerced or induced to agree to a verdict with which he dissents." *Crowder*, 383 A.2d at 340 (citing *Solar v. United States*, 86 A.2d 538, 540 (D.C.1952)) (other citations omitted). "Thus, the jury poll has long been regarded as a useful and necessary device for preserving the defendant's right to a unanimous verdict." *Id.* (citing *United States v. Brooks*, 137 U.S.App. D.C. 147, 151, 420 F.2d 1350, 1354 (1969)). "If the poll reveals that the jury is not unanimous, the rule permits the trial court to either direct the jury to retire for further deliberations or to discharge the jury." *Id.* at 340–41 (citing *Kendall v. United States*, 349 A.2d 464, 467 (D.C.1975)) (other citations omitted).

The "potential danger of coercion" undoubtedly led to our emphasis in *Crowder, supra*, on the two options available to the trial judge (directing the jury to return to its deliberations or discharging the jury) in the event a jury poll casts doubt on whether a jury verdict is unanimous. *Benlamine v. United States*, 692 A.2d 1359, 1362–63 (D.C.1997) (citing *Crowder, supra*, 383 A.2d at 342 (other citation omitted)). "The trial court has considerable discretion in assessing" whether the jury has strayed from its central function of determining guilt or innocence and into the arena of examining possible punishment. *Benlamine, supra*, 692 A.2d at 1363 (citation omitted). "In exercising its discretion, however, the trial court must seek to dissipate any potential for coerciveness and [e]nsure that the jury arrives at any subsequent verdict freely and fairly." *Id.* (citing *Crowder*, 383 A.2d at 342). "[R]eversal is required when it appears from the circumstances that a juror was forced into conforming to the majority's vote." *Id.* (citing *Harris v. United States*, 622 A.2d 697, 701 (D.C.1993)) (other citation omitted). Furthermore, our review "requires a careful examination of the factual context in which the decision [not to grant a mistrial and discharge the jury after a jury poll] was made and reversal of a trial court's decision can only occur with a finding of abuse of discretion." *Harris, supra*, 622 A.2d at 701 (citing *Crowder, supra*, 383 A.2d at 341) (internal quotation mark omitted).

"Where it is alleged that a jury verdict has been coerced, our cases demonstrate that two inquiries should be made." *Harris*, 622 A.2d at 701. "The first inquiry is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential." *Id.* "Then the two factors should be viewed together to assess the possibility of actual coercion on any juror or jurors." *Id.* at 701–02. "[W]e conduct our review of a claim of juror coercion from 'the perspective of jurors.'" *Green, supra*, 740 A.2d at 26 (citing *Benlamine, supra*, 692 A.2d at 1363). Since there was no objection to the trial court's

polling procedure and its actions in response to the jury's initial verdict form, we review this matter for plain error. *See Jones, supra,* 779 A.2d at 360; *Robinson, supra,* 649 A.2d at 586. The Supreme Court explained the plain error standard in *Johnson, supra:*

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' *[Olano, supra],* 507 U.S. at 732, 113 S.Ct. 1770. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'

*Id.* at 466–67, 117 S.Ct. 1544 (citing *Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770 in turn quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)) (citation omitted).

▮▮ We now apply the applicable legal principles to the specific factual context of this case, considering the factual context from the perspective of the jurors, *see Green, supra,* 740 A.2d at 26 (citation omitted), and focusing on two factors: "the inherent coercive potential of the situation before the court," *Harris, supra,* 622 A.2d at 701; and "the actions of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential," *Id.* When the jury foreperson announced the initial verdict of the jury regarding the charge of unregistered firearm, he stated: "Guilty technically with an addendum." The trial court permitted the foreperson to continue: "The jury unanimously agrees the defendant technically violated the law. However, several jurors believe he did not violate it in spirit. Their concerns are to be reflected in the attached statement[] whose language has yet to be agreed upon

... [t]hat we would ask the Court to read at the end of the trial proceedings." At that point, the fundamental unanimity of the jury on the guilty verdict concerning possession of an unregistered firearm had been called into question, *see Matthews, supra,* 252 A.2d at 506–07, and the potential for coerciveness clearly existed, *Crowder, supra,* 383 A.2d at 340. Therefore, "the trial judge was required to perform a pivotal role by ensuring that the jury carried out its essential role" "to determine guilt or innocence on the evidence before it[,] and ... not [to] consider the possibilities of punishment in its deliberations...." *Brown, supra,* 554 A.2d at 1160.

Rather than immediately instructing the jury to return to the jury room for further deliberations and to focus only on whether Mr. Headspeth was guilty or not guilty of the charges against him, the trial court decided to poll the jury. The first five jurors announced that they agreed with the verdict. Juror Number 6 did not give a "yes" statement to indicate his agreement with the verdict. Rather, he said, "[y]es, with the notation as is altered." The word "altered" signaled some kind of disagreement. But the judge continued saying: "Yes, I'll discuss that. But the verdict is guilty." Juror Number 6 replied: "Yes." The court said: "You understand that." The juror persisted with the notion of technical guilt replying: "Technically, yes." However, the judge (who may well have believed that the jury had come to a clear determination of guilt on the unregistered firearm charge) adamantly said: "Not technically. The verdict is guilty. Do you understand, sir?" Undaunted, the juror began a response other than, "yes": "We wrestled long and hard about that and—." The judge interjected with a longer statement.

He first reminded the jury that he instructed them to make any recommenda-

tion (concerning sentencing) on a separate sheet of paper, but returned to the notion of technical guilt, giving the following admonition: "[T]here is not a technical guilt. He is guilty or not guilty. So I want that to be clear with the entire jury...." The judge then recognized that members of the jury were "lay people and this is new to ... most if not all of you." He repeated that "the only verdict that's official is the official verdict form. Everything else on [the form] is advisory." However, the judge assured the jury regarding its recommendation of punishment of Mr. Headspeth: "As I said before, that's something I will consider at the time of sentencing.... [T]hat's the law." He did not say, as he had done with respect to the jury's second note, that: "The Court will consider the recommendation, but it is not binding on the Court."

The judge explained again, "the only official verdict, is guilty or not guilty," but added: "The jury has reached a verdict of guilty as to count two, possession of an unregistered firearm and not guilty as to count three, possession of ammunition." Immediately after this statement, the judge instructed the jury: "So I'm going to restate it, just redo it again, with my instructions that that's the only verdict that can be accepted by the Court." Some jurors may well have understood the judge to say that the verdict of guilty on the unregistered firearm claim was final and could not be changed, something which would exacerbate the coercive potential, *see Harris, supra,* 622 A.2d at 702. Indeed, another juror (not Juror Number 6) asked to speak and began by saying: "We spent much of our time wrestling with whether—." He was interrupted by the judge who indicated that he "was not being rude"; rather he interrupted as a means of being "very protective of the jury's deliberative process." While the interruption for this purpose is perfectly understanda-

ble and correct, the judge's overall response should not leave a juror with the thought that an initial vote for "technical" guilt cannot not be altered after the jury is instructed to return to the jury room for further deliberation.

Defense counsel requested a conference with the judge, and expressed concern that "at least Juror Number 6 has some reservations about what he did" and that other jurors might not have understood the trial court. He suggested that "we might be better off just sending [the jurors] back to continue their deliberations." The judge concluded that the jury should be recessed for the day, but before dismissing them, he told them, in part: "I'm going to send back another verdict form and I'm going to ask the jury to deliberate and fill out that verdict form as the jury believes is appropriate...." These words may not have alleviated the coercive potential, *see Harris, supra,* 622 A.2d at 702, nor erased the belief of at least some jurors that the vote on the second count could not be changed. In *Matthews, supra,* when a juror told the judge that her guilty vote was conditional, the judge informed her: "You have to answer either guilty or not guilty." 252 A.2d at 506. We held that the juror should not have been forced to answer "guilty or not guilty." Rather, we said, the jury should have been sent back for further deliberations because the juror's conditional response should have alerted the judge that there might not be unanimity.

In addition, the judge here advised the jury: "And, as I said before, I will, no matter what the verdict is, obviously take into consideration what the jury has said or individuals on the jury say." But, again, the judge did not remind the jury that its recommendation was not binding on him. Significantly, the judge did not admonish the jury that its essential func-

tion was to determine guilt or innocence, not punishment. Indeed, the factual context of this case underscores the wisdom of adhering closely to the fundamental legal principle: "[T]he jury is to determine guilt or innocence on the evidence before it and should not consider the possibilities of punishment in its deliberations because sentencing is exclusively within the duties of the court." *Brown, supra,* 554 A.2d at 1160 (citations omitted). This case also demonstrates the critical role the trial judge plays in ensuring the integrity of this legal principle: "[I]t is incumbent upon the trial judge to restrain [the jury]" from considering the possibilities of punishment as it deliberates on guilt or innocence. *Alston, supra,* 383 A.2d at 314 (citing *Patrick, supra,* 161 U.S.App. D.C. at 236 n. 9, 494 F.2d at 1155 n. 9 (citations omitted)); *see also Rogers v. United States,* 422 U.S., 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (where jury inquired whether trial court would accept a verdict saying "guilty as charged with extreme mercy of the court," there should have been two responses: (1) "At the very least, the court should have reminded the jury that the recommendation would not be binding in any way;" and (2) "the response should have included the admonition that the jury had no sentencing function and should reach its verdict without regard to what sentence might be imposed.") (citations omitted); *United States v. Davidson,* 367 F.2d 60, 63 (6th Cir.1966) (after initially instructing the jury that "punishment ... should never be considered by the jury in any way, in arriving at an impartial verdict as to the guilt or innocence of the accused," "a subsequent instruction that the jury may recommend leniency is in conflict with the instruction in the general charge that the jury shall not consider the punishment of a defendant in arriving at its verdict."). Another danger in this case is that the trial court's assurance that it

would "obviously" and "certainly" consider the jury's recommendation on punishment encouraged a compromise verdict. *See United States v. Hall,* 245 F.2d 338, 341 (2d Cir.1957) ("where ... a compromise has been encouraged by remarks by the trial judge indicating the probability of light punishment, a verdict of guilty cannot stand.") (citations omitted).

That the jurors deliberating on Mr. Headspeth's guilt or innocence continued to ponder, and to be concerned about, the punishment that would be meted out to Mr. Headspeth in view of his "technical guilt" is obvious when one considers the final note from the jury. The jury listed specific factors it wanted the judge to "take into account when imposing sentence." Not only did it list the factors, but also "recommend[ed] leniency in sentencing, with some jurors expressly recommending community service." Even the prosecutor recognized that the jury might have spent considerable time focusing on what its recommendation to the judge would be concerning punishment when she stated as a rationale for not declaring a mistrial right after the verdict on counts two and three, her "belief ... that [the jurors had] spent most of the time discussing how to recommend to the [c]ourt certain issues." On the peculiar facts of this record, we cannot say that the focus on punishment did not prompt a compromise verdict—guilty on the possession of unregistered firearm charge, not guilty on the offense of possession of ammunition, and inability to reach a verdict on the charge of carrying a pistol without a license.

 In sum, our careful review of the factual record here, *see Harris, supra,* 622 A.2d at 701 (citing *Crowder, supra,* 383 A.2d at 341), constrains us to conclude that the trial court committed plain error by (1) not immediately sending the jury back for further deliberations, with instructions

that it was not to consider punishment in determining guilt or innocence, when it saw the initial verdict form bearing "guilty, technically" with a notation at the bottom stating that Mr. Headspeth "did not violate [the law] in spirit"; (2) failing to grant a mistrial when Juror Number 6 and at least one other juror called into question the jury's verdict by continuing to try to explain to the judge their view of the matter, thus raising the specter of a compromise verdict; and (3) continuing to advise the jury that the court "obviously would consider" its sentencing recommendation, even saying as it was about to dismiss the jurors: "I will certainly consider the jury's recommendation at the time of sentence," without re-advising the jury that its recommendation would not be binding on the court. Thus, there is " 'error,' . . . that is 'plain' and . . . that 'affects substantial rights.' " *Johnson, supra,* 520 U.S. at 467, 117 S.Ct. 1544 (citing *Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770). Moreover, the error "seriously affects the fairness, integrity, or public reputation of [the] judicial proceeding[]." *Id.* (quoting *Young, supra,* 470 U.S. at 15, 105 S.Ct. 1038) (other citations omitted).

Accordingly, for the foregoing reasons, we reverse the judgment of the trial court, and remand this case for a new trial.

*So ordered.*